UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-60104
_____

CEASAR FELTON, Etc.; ET AL.,

Plaintiffs,

LYNDELL CARTER, On behalf of himself and as representative of a
class of all others similarly situated,

Plaintiff-Appellee,

versus

SAM POLLES, Etc.; ET AL.,

Defendants,

RANDALL MILLER, Colonel; TERRY THOMAS, Lieutenant,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Mississippi

December 17, 2002

Before JOLLY, JONES, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge

For the alleged racially discriminatory conduct in state
employment extending through 15 years, the numerous issues in this
interlocutory appeal from a qualified immunity denial underscore
the importance of exacting application of each of the two parts
comprising the long-established test for ruling on such immunity:
(1) *under existing law*, does the plaintiff allege a violation of an

actual, *clearly established* constitutional or federal statutory right; and (2) *if so*, was the defendant's conduct *objectively unreasonable* in the light of *clearly established law at the time of that conduct*. The two principal issues at hand concern the first prong.

First, can a state employee assert a claim against his supervisor, in his individual capacity, for violation of 42 U.S.C. § 1981 (proscribes racial discrimination in "mak[ing] and enforce[ment]" of contracts, including their "performance" and "enjoyment of all benefits ... and conditions of the contractual relationship"), when that § 1981 right has *not* been asserted through 42 U.S.C. § 1983 (creating action against person who, under color of state law, deprives another of constitutional or federal statutory right)?

Second, in determining whether, *under existing law*, a plaintiff has alleged the deprivation of a *clearly established* constitutional or federal statutory right, what consideration is to be accorded alleged unlawful conduct that occurred *outside* the applicable limitations period?

Lyndell Carter's supervisors, Lieutenant Terry Thomas and Colonel Randall Miller, contend that Carter fails each prong of qualified immunity analysis: that he does not state the deprivation of a § 1981 or Fourteenth Amendment right against

2

racial discrimination in his state employment; and that he does not show their conduct was objectively unreasonable.

This appeal is a classic example of the interplay — sometimes conflicting — between Title VII, § 1981, § 1983, and, most especially, qualified immunity in a racial discrimination action brought by a state employee against his co-state employees and his state employer. Likewise, it is a classic example of the care that must be taken in framing and pursuing such an action employing multiple theories of recovery. It is hoped this opinion's extensive treatment of this interplay will clear up some of the confusion surrounding such actions.

Based upon our analysis of the numerous issues at hand, we hold that Thomas and Miller, in their individual capacities, are entitled to qualified immunity from Carter's §§ 1981 and 1983 claims. **REVERSED and REMANDED.**

I.

Carter has been an employee of the Mississippi Department of Wildlife, Fisheries, and Parks since 1985. Presenting federal and state law claims, he and three others began this action *in 1999* against, among others, Thomas and Miller (official and individual capacities), and the Department. The federal claims — essentially for race discrimination — were brought under: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.;* and §§ 1981 and 1983.

3

Because of the multiple parties and claims in this action, it is necessary to identify those involved in this interlocutory appeal. It involves only Carter, Thomas, and Miller. It concerns only the summary judgment denial of qualified immunity from the §§ 1981 and 1983 claims against Thomas and Miller in their individual capacities. (Although one of the three federal claims is pursuant to Title VII, it is *not* at issue now.) In addition to the numerous sub-issues pertaining here to qualified immunity *vel non*, and the limitations on our jurisdiction because this is an interlocutory appeal, this appeal is framed by quite a few factors present in this action: numerous parties, claims, and district court rulings; and, most especially, the *15-year period* between the first of many alleged acts of discrimination and this action's being filed. In order to address qualified immunity, these numerous factors must be discussed.

For starters, three discrete time periods pertain to the §§ 1981 and 1983 claims: (1) *1985 to 1992*, when Carter was under Thomas' supervision; (2) *1992 to 1995*, when Carter was promoted and removed from Thomas' supervision; and (3) *1995 to 1997*, when Carter was reassigned to Thomas' supervision. Again, this action was not filed until 1999. The following facts are from the summary judgment record.

*In 1985*, Carter began with the Department as a Conservation Officer in Grenada County; Thomas was his supervisor. At the end

4

of Carter's mandatory one-year probationary period, Thomas recommended him for permanent employment status with the Department. Carter does not claim to have *ever* heard Thomas make a racial slur throughout Carter's state employment.

Nevertheless, Carter claims "racial opposition" by Thomas *until 1992*, when Carter was promoted. For example, Carter alleges: *on his first day of employment in 1985*, Thomas "[o]ccasionally ... would turn around and roll his eyes at [Carter] trying to intimidate [him]"; another supervisor told Carter "he knew there would be major problems with hiring a black officer in Thomas' district"; the division chief told Carter that Thomas "did not want a black officer working in his district"; another officer advised Carter that Thomas had ordered a background check performed on Carter and had said "in a meeting ... he did not want any 'niggers' working in his district"; Appellant Miller, then a Hunter Safety Coordinator (became Department's Chief of Enforcement in 1993), told Carter "he knew some of the things that ... Thomas ha[d] said in [Miller's] presence were racially motivated"; Carter "believe[s] Thomas coordinated with a Highway Patrol Officer in Montgomery County" to stop Carter for speeding; Thomas told Carter's partner he "did not want any 'niggers' at the funeral" of another officer's mother; and Thomas assigned Carter to "a remote area", without adequate backup, and refused to issue him new equipment. Each act

5

of alleged discrimination occurred well outside the applicable three-year limitations period.

*In 1992*, Carter was promoted to Investigator, a position he held *until 1995*. Although Carter was not then under Thomas' supervision, Thomas allegedly informed Carter's new supervisor of "a complaint [against Carter] for stopping females in Montgomery County and harassing them". Again, this alleged incident is outside the limitations period.

*In 1995*, the Investigative Division was disbanded. Carter was reassigned to Grenada County, again under Thomas' supervision. Thomas maintains problems soon surfaced with Carter's work performance, stemming in part from a private business he had begun operating while in the Investigative Division.

Thomas states: Carter missed a day of work without permission in *September 1995*, apparently to attend an event for which his business had a contract; co-workers complained Carter was handling personal business while on duty; regularly, Thomas could not find Carter at his post on Grenada Lake; during *November 1995*, Carter put unusually high mileage on his vehicle, but wrote no hunting-violation tickets; co-workers did not see Carter during a scheduled duck-hunting detail on *2 December 1995*; and, after reviewing the Time-Attendance-Leave (TAL) records for the officers under his command, Thomas discovered Carter had purchased a vehicle battery with his state-issued fuel card, without prior permission and

6

despite, less than three months earlier, having purchased another battery.

According to Thomas, in the light of the battery incident and concerns over Carter's job performance, Thomas and Miller (Chief of Enforcement) agreed in *January 1996* it would be appropriate to review Carter's credit card and TAL records. The review revealed 37 discrepancies concerning, in addition to the battery incident, misusing a state telephone card and falsifying TAL records. Thomas detailed the discrepancies in a *17 January 1996* memo to Miller; he forwarded it to the Department's legal counsel.

In *July 1996*, a hearing was held before the Department's Executive Director (a defendant granted qualified immunity by the district court). Carter *admitted* misusing his telephone card. He agreed to reimburse the State, received a written reprimand, and was suspended for five days without pay.

Carter believes the investigation and suspension were racially motivated. Concerning racial discrimination, he also states: Thomas denied him leave on *3-4 July 1995*, although it had been approved by Carter's prior supervisor; in *January 1996* (the month Carter's credit card and TAL records were reviewed), an officer overheard Thomas tell Miller, "I'm just about to get that nigger"; and Thomas denied Carter leave for *23-24 March 1996*, after having approved it.

Carter also claims racial discrimination in the denial of his *September 1996* application for a *June 1997* Hunter Safety Coordinator vacancy. In support, Carter notes that he outscored the white applicant on the interview portion of the selection process. (As discussed *infra*, the white applicant received a higher total score, however, pursuant to the procedure utilized by the State Personnel Board.)

Finally, in *March 1997*, Thomas gave Carter a low performance evaluation, resulting in his being placed on a performance improvement plan and postponing, for approximately one month, a scheduled $300 annual wage increase. (As a result, Carter apparently lost *approximately $25*.) Thomas maintains the evaluation was low because of the above-mentioned: (1) inability to contact Carter during duty hours; (2) low ticket issuance; (3) erroneous TAL reporting; and (4) failure to return forms.

In *June 1997*, shortly after the performance evaluation, Carter was removed from Thomas' supervision and transferred to that of another officer.

In *March 1999*, two years after the low evaluation given Carter, he and another filed this putative class action against the Department, Thomas, Miller, and five other named defendants, as well as 20 unknown defendants, presenting federal and state law claims and seeking declaratory, injunctive, and monetary relief. The complaint, as amended that May, also involved claims by two

8

other named plaintiffs (total of four). The plaintiffs never sought class certification.

In addition to two state law claims, the following federal claims were presented: *Count 1*, "race discrimination", in violation of § 1981; *Count 2*, "den[ial of] ... employment and promotion opportunities because of ... race", in violation of Title VII; and, *Count 3*, "violat[ion of] constitutional rights ... secured pursuant to the 5th Amendment and 14th Amendment", *brought under § 1983*. Therefore, unlike the final count, the § 1981 claim (Count 1) was *not* brought pursuant to § 1983.

Thomas, Miller, and the five other individual defendants, in their individual capacities, moved to dismiss under FED. R. CIV. P. 12 (b)(6) (failure to state claim) or, in the alternative, for summary judgment, claiming, *inter alia*, qualified immunity. Through an extremely comprehensive and detailed opinion, qualified immunity was granted to all but Thomas and Miller. **Felton v. Polles**, No. 3:99CV200LN, at 13 (S.D. Miss. 14 Jan. 2000) (**Felton I**).

After completion of discovery, the Department, Thomas, and Miller moved for summary judgment; the two individuals again claimed qualified immunity. Concerning them, and in another detailed opinion, the court referenced its first opinion and concluded that the reasons for the earlier denial remained. **Felton**

*v. Polles*, No. 3:99CV200LN, at 3 (S.D. Miss. 23 Jan. 2001) (*Felton II*).

On the other hand, the Department's motion was granted in most respects, including for Carter's claims based on not being promoted to Hunter Safety Coordinator in 1997. *Felton II*, at 17-18. In that regard, the court found no evidence that the failure to promote was pretextual. Noting that Carter's combined interview and State Personnel Board score for the position was lower than the white applicant's because of the point system used by the Board for factors such as an applicant's education level or military service, it stated: "Carter's grievance ... should be with the [State Personnel] Board and not the Department". *Id.* at 13. The Department's motion was denied, however, "*[t]o the extent* ... [it was] *based* on the fact that *neither Thomas nor Miller* individually discriminated against Carter". *Id.* at 3 (emphasis added).

## II.

This interlocutory appeal, concerning only one of the four named plaintiffs (Carter), is brought by the only two individual defendants denied qualified immunity (individual capacity), *not* by the Department; it concerns qualified immunity, *not the merits*. It is well-established that, "to the extent ... it turns on an issue of law", a qualified immunity denial is appealable. *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 548 (5th Cir. 1997) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).

10

Among other protections it provides, "qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law". *Thompson v. Upshur County, Tex.*, 245 F.3d 447, 456 (5th Cir. 2001). To that end:

> Where a defendant pleads qualified immunity and shows he is a governmental official whose position involves the exercise of discretion, the *plaintiff then has the burden* "to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law." We do "not require that an official demonstrate that he did not violate clearly established federal rights; *our precedent places that burden upon plaintiffs*."

*Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997) (emphasis added; internal citations omitted; quoting *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992)).

"The bifurcated test for qualified immunity is quite familiar: (1) whether the plaintiff has alleged a violation of a clearly established constitutional [or federal statutory] right; and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident." *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 325 (5th Cir. 1998).

The first prong requires determining "whether the plaintiff has alleged the deprivation of an *actual* constitutional [or

11

statutory] right", ***Conn v. Gabbert***, 526 U.S. 286, 290 (1999) (emphasis added) — that is, a right "*clearly established ... under ... currently applicable ... standards*", ***Hare***, 135 F.3d at 325-26 (emphasis added; internal citations and quotation marks omitted). *Only* if the plaintiff has done so should the court proceed to the second prong. As shown *infra*, this first prong serves a very important purpose.

The second prong "is better understood as two separate inquiries: whether the allegedly violated constitutional rights were *clearly established at the time of the incident*; and, if so, whether the conduct of the defendants was *objectively unreasonable* in the light of that then clearly established law". ***Hare***, 135 F.3d at 326 (first emphasis in original).

To satisfy the first prong (claimed violation, *under existing law*, of actual, *clearly established* constitutional or federal statutory right), a plaintiff may allege the claimed deprivation at a higher level of generality. *See* ***Thompson***, 245 F.3d at 459. For the second prong (*objectively unreasonable* conduct in the light of *clearly established law at time of incident*), however,

> the right ... alleged to have [been] violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

***Anderson v. Creighton***, 483 U.S. 635, 640 (1987).

12

The second prong "focuses not only on the state of the law at the time of the complained of conduct, but also on the particulars of the challenged conduct and/or of the factual setting in which it took place". *Pierce*, 117 F.3d at 872. A "defendant's acts are ... objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Thompson*, 245 F.3d at 457 (emphasis in original).

"It goes without saying that we review a summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmovant." *Hare*, 135 F.3d at 326. Moreover, due to our limited jurisdiction for this interlocutory appeal, we "cannot review whether the evidence 'could support a finding that particular conduct occurred'". *Southard*, 114 F.3d at 548 (quoting *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)).

On the other hand, we do have "interlocutory jurisdiction to 'take, as given, the facts that the district court assumed when it denied summary judgment' and *determine whether these facts state a claim under clearly established law*". *Nerren v. Livingston Police Dept.*, 86 F.3d 469, 472 (5th Cir. 1996) (emphasis added; quoting *Johnson v. Jones*, 515 U.S. 304, 319 (1995)). Likewise, we may review: (1) "[t]he issue of whether and when a right is clearly established"; and (2) "to the extent that the relevant discrete,

13

historic facts are undisputed, ... the question of the objective reasonableness of the defendant's conduct". *Pierce*, 117 F.3d at 871 (internal citations omitted).

Title VII is not at issue now. "Because ... qualified immunity protects a public official from liability for money damages in her *individual capacity only*, [it] is inapplicable in the Title VII context." *Harvey v. Blake*, 913 F.2d 226, 228 (5th Cir. 1990) (emphasis added). This is because, as the district court noted: "[U]nder Title VII, a plaintiff may sue only his ... employer, ... and few, if any, of the named defendants other than the [Department] would seem to qualify as a Title VII 'employer'". *Felton I*, at 6 n.7. (Carter does not appear to contend either Thomas or Miller is an "employer" for Title VII purposes. Obviously, non-"employers'", such as Thomas and Miller's, not being liable under Title VII is one of the reasons why parallel claims are brought against them under § 1981.) Therefore, for this interlocutory appeal, the claims at issue for Thomas and Miller, in their individual capacities, are only under §§ 1981 and 1983.

In addition to the three counts for the Title VII claim *not* at issue and for the §§ 1981 and 1983 claims detailed below, Carter's amended complaint earlier claims:

> [H]e was discriminated against in violation of *Title VII* ... because of his race and *retaliated against* ... in violation of ... *Title VII* ... because he complained about his treatment and the treatment of other Blacks. And *also* in violation of ... *§ 1983*.

14

(Emphasis added.)  In denying qualified immunity, the district court indicated a possible *retaliation claim* but did not identify the applicable statute.  **Felton I**, at 4; **Felton II**, at 2.  Thomas and Miller categorize the claims at issue here as only disparate treatment and racial harassment; retaliation is *not* included.  Carter's brief repeatedly similarly identifies his claims against Thomas.  Accordingly, Carter's counsel was asked at oral argument if his § 1981 claims were for disparate treatment and racial harassment; he responded they were.  In sum, retaliation is not at issue for purposes of qualified immunity *vel non* for Thomas and Miller.

*For Thomas*, the claims are:  discrimination, under § 1981, framed by Carter as involving racial harassment and disparate treatment;  and Fifth and Fourteenth Amendment violations (*presumably* equal protection), under § 1983.

*For Miller*, the only claim is under § 1983 for deliberate indifference to Carter's constitutionally protected rights.  The district court concluded:  "[T]he evidence fails to demonstrate discriminatory intent on behalf of Miller".  **Felton I**, at 12.  On the other hand, it noted:  "[A] supervisor may be liable under § 1983 if 'that official, by action or inaction, demonstrates a deliberate indifference to a plaintiff's constitutionally protected rights'".  **Id.** at 12-13 (quoting **Southard**, 114 F.3d at 550).

A.

*Regarding Thomas*, the district court concluded there is "a genuine issue of material fact as to whether ... [he] ... intentionally discriminated against [Carter]". *Id.* at 7. Noting that "some of the incidences alleged by Carter may consist of mere speculation or hearsay", *id.* at 11, the court also noted: "Carter ... recounts numerous instances of alleged racial harassment and discrimination by ... Thomas *over the course of Carter's [ongoing 15-year] employment*, some of which constitute direct evidence of discriminatory intent", *id.* at 10 (emphasis added). The district court identified "comments from supervisory officials indicating ... Thomas did not want black officers working in his district". *Id.* at 11.

In that light, the court held:

> Carter has made allegations that, if proven, would be sufficient to establish a violation by Thomas of a clearly established constitutional right [and] the court has little difficulty concluding that if [Carter's] allegations as to Thomas' actions and motivation were proven, then Thomas' conduct was not objectively reasonable, as a reasonable officer in Thomas' position would have known that treating one differently based upon his or her race is prohibited.

*Id.* Accordingly, Thomas was denied qualified immunity.

1.

It is more than well-established that, unlike § 1981, § 1983 "is not itself a source of substantive rights"; instead, it provides "a method for vindicating federal rights *elsewhere*

16

*conferred"*.  ***Baker v. McCollan***, 443 U.S. 137, 144 n.3 (1979) (emphasis added).  As noted, Carter's § 1983 claim is for Fifth and Fourteenth Amendment (*presumably* equal protection) violations; it is *not* for vindication of the § 1981 rights he claims were violated (separate count).

Section 1981 provides:

> (a)  Statement of equal rights
>
> All persons ... shall have the same right ... to *make and enforce contracts* ... as is enjoyed by white citizens....
>
> (b)  *"Make and enforce contracts" defined*
>
> For purposes of this section, the term "make and enforce contracts" includes the making, *performance*, modification, and termination of contracts, *and the enjoyment of* all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c)  Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination *and impairment under color of State law*.

42 U.S.C. § 1981 (emphasis added).  Subsections (b) and (c) were added by the Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071.  These two new subsections play an important role in deciding whether Carter satisfies the first prong for qualified immunity.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or

17

> usage, of any State ..., subjects ... any citizen of the United States ... to the deprivation of any rights, privileges, or immunities *secured by the Constitution and laws*, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983 (emphasis added). Whereas "section 1981 provides a cause of action for public or private discrimination based on race", § 1983 does *not* reach purely private conduct. *Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 762 (5th Cir. 1986) (emphasis added), *aff'd in part and remanded in part*, 491 U.S. 701 (1989).

### a.

Apart from the specifics of a discrimination claim, discussed *infra*, there are several potential problems with pursuing a § 1981 claim against Thomas *in his individual capacity*. Some of these points were addressed by our court subsequent to the qualified immunity denial at issue here. Because these points were not raised either in district court or here, the district court did *not* address, *nor do the parties brief*, them. Nevertheless, we address them because they are germane, if not necessary, to the first prong of the qualified immunity analysis: whether, under currently applicable law, Carter has stated a claim. *See Nerren*, 86 F.3d at 472, 473.

First, it is not clear whether a § 1981 claim lies against an individual defendant not a party to the contract giving rise to the claim.  Obviously, Carter's contractual relation was not with Thomas; it was with the State of Mississippi.

"[T]his Court has not yet decided whether a plaintiff has a cause of action under section 1981 against a third party for interference with the plaintiff's right to make and enforce contracts".  *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997), *cert. denied*, 522 U.S. 1068 (1998).  Prior to *Bellows*, however, *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir.), *cert. denied*, 422 U.S. 1006 (1975), had held that the director of a state entity could be personally liable under § 1981 for interfering with the plaintiff's right to contract with the State (refusal to hire because wife was black).

*Bellows* distinguished *Faraca* on the basis that "[t]he director was only nominally a third party".  *Bellows*, 118 F.3d at 274.  "In substance, because he was acting on behalf of the state when he decided not to hire Faraca — thus making his hiring decision indistinguishable from that of the state — the director and the state were essentially the same."  *Id.*

In the light of *Bellows*' limited reading of *Faraca*, it would appear Thomas could *only* be amenable to § 1981 liability *if* he were "essentially the same" as the State for purposes of the complained-

19

of conduct.  He does *not* appear to be.  However, as discussed below, we need not decide this issue.

(2)

Even if Thomas had such status, a § 1981 discrimination claim against him *in his individual capacity* is further complicated by a somewhat recent decision by our court, subsequent to the qualified immunity denial in this case: ***Oden v. Oktibbeha County, Miss.***, 246 F.3d 458 (5th Cir.), *cert. denied*, 122 S. Ct. 341, and *cert. denied*, 122 S. Ct. 342 (2001).  In reversing a judgment against a county sheriff *in his individual capacity* for an alleged racially-motivated failure to promote, ***Oden*** held:

> Only officials should be responsible for discriminatory decisions concerning government employment contracts.  *Likewise, when a plaintiff asserts a cause of action under § 1981 for discrimination in the terms and conditions of a municipal employment contract*, the proper defendant is the government employer *in his official capacity*.

***Id.*** at 464 (internal citations omitted; emphasis added).

***Oden*** speaks of discrimination in the terms and conditions of a *municipal* employment contract; we see no reason not to extend its holding to discrimination in the terms and conditions of *state* employment contracts.

(3)

The final point is whether, as Carter has done in this action, a state employee can assert a claim against his *supervisor*, in his

20

*individual capacity,* for violation of § 1981, when the § 1981 right has *not* been asserted through § 1983. Carter's independent § 1981 claim — *not* brought through § 1983 — against Thomas in his individual capacity is contrary to ***Jett v. Dallas Indep. Sch. Dist.***, 491 U.S. 701 (1989): "[T]he express 'action at law' *provided by § 1983* for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the *exclusive* federal damages remedy for the violation of the rights guaranteed by § 1981 *when the claim is pressed against a state actor*". ***Id.*** at 735 (emphasis added).

Again, ***Oden*** comes into play. In considering additional § 1981 claims against the county and its sheriff *in his official capacity*, ***Oden*** characterized ***Jett*** as holding "plaintiffs *must* assert a cause of action against state actors *under § 1983* to remedy violations of civil rights *under § 1981*". ***Oden***, 246 F.3d at 463 (emphasis added). ***Oden*** recognized some doubt had been cast on ***Jett's*** viability by the above-referenced addition in 1991 of subsection (c) to § 1981: "The rights protected by this section are protected against impairment by nongovernmental discrimination and *impairment under color of State law*". 42 U.S.C. § 1981(c) (emphasis added). ***Oden*** nonetheless held: "Because Congress neither expressed its intent to overrule ***Jett***, nor explicitly created a remedy against state actors in addition to § 1983, we are not willing to deviate

21

from the Supreme Court's analysis of § 1981 in *Jett*".  *Oden*, 246 F.3d at 464.  Accordingly, "Oden could not maintain an *independent* cause of action under § 1981 against [the] County and Sheriff ... *in his official capacity*".  *Id.* (emphasis added).

*Jett* involved a § 1981 action against a school district; *Oden* relied on *Jett* only in addressing § 1981 claims against the county and its sheriff *in his official capacity*.  Nevertheless, we cannot ignore *Jett*:  "We hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the *exclusive* federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a *state actor*".  *Jett*, 491 U.S. at 735 (emphasis added).

*Jett* repeatedly phrases its holding with respect to "state actors" — not simply governmental entities.  *See, e.g.*, 491 U.S. at 731 ("We think the history of the 1866 Act [(precursor to § 1981)] and the 1871 Act [(precursor to § 1983)] ... indicates that Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against *state actors* alleging violation of the rights declared in § 1981." (emphasis added)); *id.* at 733 ("Section 1983 provides an explicit remedy in damages which, with its limitations on municipal liability, Congress thought suitable to carry ... into effect the rights guaranteed by § 1981 as against *state actors*." (internal

22

quotation marks omitted; ellipsis in original; emphasis added));
*id.* at 734 ("The historical evidence surrounding the revision of 1874 [(amending what became § 1983)] further indicates that Congress thought that the declaration of rights in § 1981 would be enforced against *state actors* through the remedial provisions of § 1983." (emphasis added)); *but see id.* at 733 (discussing Court's "conclusion that the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental *units*" (emphasis added)).

Thomas is a state actor for purposes of this action. "[S]tate employment is generally sufficient to render the defendant a state actor". *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 935 n.18 (1982); *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *Lugar*). Accordingly, it appears § 1983 constitutes Carter's *exclusive* remedy for the claimed § 1981 violation by Thomas. *See, e.g., Ebrahimi v. City of Huntsville Bd. of Educ.*, 905 F. Supp. 993, 996 (N.D. Ala. 1995) ("*Jett* is clear that a claim for damages against a state *actor* for violation of rights contained in § 1981 must be redressed pursuant to the explicit remedial provisions of § 1983. The Supreme Court did not make a distinction between state entities and individuals acting pursuant to color of state law. Therefore, when a state employee seeks to hold an individual fellow state employee liable in damages for violation of § 1981 rights, such

23

claim must also be pursued under the remedial provisions of §
1983." (emphasis in original)).

Needless to say, requiring § 1981 claims against state actors
to be pursued through § 1983 is not a mere pleading formality. One
of the reasons why the § 1981 claim in this situation must be
asserted through § 1983 follows. Although *respondeat superior*
liability may be available through § 1981, *see, e.g., **Gen. Bldg.
Contractors Ass'n v. Pennsylvania***, 458 U.S. 375, 395 (1982);
***Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.***, 876 F.2d 1231,
1234-36 (5th Cir. 1989), it is *not* available through § 1983, *see,
e.g., **Pineda v. City of Houston***, 291 F.3d 325, 328 (5th Cir. 2002).
True, that form of liability against the governmental entity has no
direct bearing on qualified immunity from individual capacity
liability, but it is germane to whether a claim has been stated,
bearing on the first prong of qualified immunity analysis.

Again, Carter's § 1983 claim (Count 3) does not include §
1981. Instead, it is for violations of "constitutional rights ...
secured pursuant to the *5th Amendment* and *14th Amendment* of the
United States Constitution": (1) an equal protection claim
(*presumably*) against Thomas; and (2) a deliberate indifference
claim against Miller. The § 1981 claim is independent (Count 1).
In sum, Carter has failed to invoke the *only* remedy available to
him for the claimed deprivation of his § 1981 rights — he has
essentially failed to state a claim.

b.

In any event, and as discussed below, even if Carter can maintain an independent § 1981 claim against Thomas in his individual capacity, or even if his complaint is sufficiently broad to incorporate the alleged § 1981 deprivations into his § 1983 claim, or even if amendment were permitted on remand, Thomas is nevertheless entitled to qualified immunity against the discrimination claims involved in this interlocutory appeal — racial harassment and disparate treatment. "To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerns one or more of the activities enumerated in the statute [*e.g.*, enforcement of a contract]." ***Green v. State Bar of Tex.***, 27 F.3d 1083, 1086 (5th Cir. 1994).

(1)

A *harassment claim* under § 1981 has not always been "clearly established". For the pre-amended version of § 1981, and pursuant to ***Patterson v. McLean Credit Union***, 491 U.S. 164 (1989),

> employment discrimination claims alleging racial harassment [were] "not actionable under § 1981, *which covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process.* Rather, such conduct is actionable *under the more expansive reach of Title VII*".

25

*Lavender v. V & B Transmissions and Auto Repair*, 897 F.2d 805, 806

(5th Cir. 1990) (emphasis added; quoting *Patterson*, 491 U.S. at

179-80).  However:

> In the Civil Rights Act of 1991, ...
> Congress legislatively reversed *Patterson*.
> Section 1981 now specifically states that,
> "[f]or purposes of this section, the term
> 'make and enforce contracts' includes the
> making, *performance*, modification, and
> termination of contracts, *and the enjoyment* of
> all benefits, privileges, terms, and
> conditions of the contractual relationship."
> 42 U.S.C. § 1981(b).

*Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San*

*Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) (emphasis added).

Therefore, "[u]nder § 1981 as amended by the [1991] Act,

*racial harassment and other discrimination* in an employment

relation occurring *after contract formation* is actionable".

*Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1372 (5th Cir. 1992)

(emphasis added), *cert. denied*, 511 U.S. 1068 (1994).  Although our

court recognizes a § 1981 racial harassment claim against an

individual, it has apparently not stated the *prima facie* elements

for it.  *See, e.g., Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d

927 (1996), *cert. denied*, 519 U.S. 1091 (1997); *Wallace v. Tex.*

*Tech. Univ.*, 80 F.3d 1042 (5th Cir. 1996).

Usually, racial harassment is thought of in terms of Title

VII.  Along this line, our court has relied on Title VII principles

for guidance in parallel § 1981 actions.  *See, e.g., Shackelford v.*

26

*Deloitte & Touche, L.L.P.*, 190 F.3d 398, 403-04 n.2 (5th Cir. 1999) ("When used as parallel causes of action, Title VII and section 1981 require the same proof to establish liability."); *see also Bunch v. Bullard*, 795 F.2d 384, 387 n.1 (5th Cir. 1986).

Again, liability under Title VII lies only against "employers" as defined by Title VII. *See*, *e.g.,* 42 U.S.C. § 2000e(b) (definition of "employer") & 2000e-2(a) (*inter alia*, proscribes racial discrimination by "employer"). Regarding *Title VII*, "[a] prima facie case of racial harassment alleging hostile work environment normally consists of five elements", *Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343, 353 (5th Cir. 2001):

> (1) the employee belongs to a protected group;
> (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term[,] condition or privilege of employment; (5) *the employer knew or should have known of the harassment in question and failed to take prompt remedial action.*

*Id.* (emphasis added). The fifth element (directed at the *employer*) presents an obvious incongruity for a § 1981 claim against an individual.

Accordingly, *looking again to Title VII*, "where the harassment is allegedly committed by a supervisor with immediate (or successively higher) authority over the harassment victim, the plaintiff employee needs to satisfy only the first four of the elements listed above". *Id.* (citing *Faragher v. City of Boca*

27

*Raton*, 524 U.S. 775, 807 (1998)).  Therefore, in the light of our court's reliance on Title VII principles for guidance in parallel § 1981 actions, and because Thomas was Carter's supervisor, we *assume* that, to have asserted a § 1981 racial harassment claim, Carter had to provide summary judgment evidence for each of the first four above-listed *prima facie* elements.

It is essential to identify what conduct is in play.  In district court, in response to the Defendants' contention that much of the alleged discriminatory conduct could not be considered because it was barred by the statute of limitations, the court ruled:  "[W]hile the statute ... may bar bringing an action based upon those alleged incidences, they may still be considered as evidence of discriminatory intent".  *Felton I*, at 5 n.6.  Such incidents occurring more than three years prior to this action's being filed (17 March 1999) may be considered as "relevant background information to current discriminatory acts".  *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (Title VII).  On the other hand, they are not actionable for a number of reasons.

First is the obvious statute of limitations bar referenced by the district court.  *See* **National R.R. Passenger Corp. v. Morgan**, 536 U.S. 101 (2002) (suggesting discrete acts, as opposed to hostile work environment claims, outside the applicable limitations period, are not actionable).  "The limitations period applicable to § 1981 claims is that applied to the most closely analogous claim

28

under state law." ***Cervantes v. IMCO, Halliburton Servs.***, 724 F.2d 511, 513 n.4 (5th Cir. 1984). It is undisputed that, under Mississippi law, the relevant period is three years.

Second, as noted, the Supreme Court held in 1989 in ***Patterson*** that racial harassment claims were not actionable under § 1981. 491 U.S. at 179-80. Although § 1981 was amended to "legislatively reverse[]" ***Patterson***, the amendment "is *not* to be given retroactive effect". ***Nat'l Ass'n of Gov't Employers***, 40 F.3d at 713 (emphasis added). Thus, even apart from the limitations consideration, conduct prior to the 21 November 1991 amendment of § 1981 is not actionable in a § 1981 harassment claim. Accordingly, as discussed *infra*, the majority of Carter's allegations — which reach as far back as 1985 and are, in large part, double hearsay — are only relevant as background information.

This action was filed on 17 March 1999. Therefore, within the relevant limitations period are: (1) the 23-24 March 1996 leave-denial (during turkey hunting season); (2) the January through July 1996 investigation regarding the credit card and TAL records (Thomas' involvement, however, was in preparing the 17 January 1996 memo — *outside the limitations period*); (3) the promotion-denial for the June 1997 Hunter Safety Coordinator vacancy (for which the district court found no evidence of pretext and granted the Department summary judgment, opining that Carter's complaint was "with the [State Personnel] Board and not the Department", ***Felton***

29

*II*, at 13); and (4) the March 1997 unsatisfactory performance evaluation, resulting in Carter's being placed on a performance improvement plan and missing approximately one month of an annual wage increase (*loss of approximately $25*).

Actionable harassment must involve "racially discriminatory intimidation, ridicule and insults". *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000); *see also* *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). And, as noted, it must have also affected a term, condition, or privilege of employment. "For harassment on the basis of race to affect a term, condition, or privilege of employment, as required to support a hostile work environment claim under Title VII, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment". *Ramsey*, 286 F.3d at 268 (quoting *Harris*, 510 U.S. at 21 (1993); internal quotation marks omitted).

These allegations, accepted as true and viewed in the light most favorable to Carter, cannot constitute § 1981 racial harassment. There are no allegations of intimidation, ridicule, or insults within the actionable time period. Nor are any "sufficiently severe or pervasive to alter the conditions of [Carter's] employment and create an abusive working environment". *Id.* (For example, Carter does not state he has *ever* heard Thomas utter a racial slur.) The complained-of conduct falling within the

30

relevant period is more suited to Carter's disparate treatment claim, discussed *infra.*

Because Carter's brief states he "was subjected to continuo[u]s harassment and continuo[u]s disparate treatment", it may be that he attempts to invoke the continuing violation doctrine. Any such attempt fails.

"The continuing violation theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, *one or more of which falls within the limitations period.*" **Celestine**, 266 F.3d at 351 (citing **Messer v. Meno**, 130 F.3d 130, 135 (5th Cir. 1997); emphasis added). This "doctrine does not automatically attach in hostile work environment cases, and the burden remains on the employee to demonstrate an organized scheme led to and included the present violation". **Id.** at 352. And, the doctrine "'requires the *same type* of discriminatory acts to occur both inside and outside the limitations period,' such that a valid connection exists between them". **Id.** (quoting **Martineau v. ARCO Chem. Co.**, 203 F.3d 904, 913 (5th Cir. 2000); emphasis added).

The majority of allegations that might tend to support a *harassment claim* allegedly occurred during Carter's *first* term under Thomas' supervision: *1985 to 1992.* Carter was then promoted and placed under another officer's supervision *until 1995* — nearly three years. The only complained-of conduct during that three-year

31

period is Thomas' informing Carter's new supervisor that Carter had been stopping females in Montgomery County.  This very distinct, three-year break defeats any attempt to establish a continuing violation by tying incidents that allegedly occurred *prior* to Carter's second term under Thomas' supervision (*1995-1997*) to incidents that allegedly occurred *during* that second term.

The only incident that occurred during that second term which even approaches harassment is the allegation that Carter was told by another officer he overheard Thomas tell Miller *in January 1996* (month during which Carter's TAL and credit card records were being reviewed):  "I'm just about to get that nigger".  However, even this allegation — again double hearsay — falls outside the limitations period.

In sum, Carter has not alleged anything that approaches harassment within the relevant time frame, and any attempt to invoke the continuing violation doctrine fails.  Accordingly, "[t]aking [Carter's] allegations as true", and viewing all of the evidence in a light most favorable to Carter, he has failed to "state a [§ 1981 racial harassment] claim against [Thomas] under clearly established [currently applicable] law".  *Southard*, 114 F.3d at 548 (internal quotation marks omitted).  Restated, Carter has not satisfied the first prong for overcoming qualified immunity.                              (2)

Likewise, for his *disparate treatment claim* against Thomas, and again assuming Carter could maintain a § 1981 claim, *independent* from § 1983, against him in his individual capacity, Carter has for the most part failed to state a claim sufficient to satisfy the first prong for overcoming qualified immunity. And, for the conduct for which he arguably does satisfy that prong, he fails to satisfy the second: he fails to show Thomas' conduct was objectively unreasonable.

For Carter's disparate treatment claim, and in the light of our precedent instructing that Title VII principles inform our treatment of parallel § 1981 claims, the complained-of conduct must rise to the level of an "ultimate employment decision". "Title VII was designed to address *ultimate employment decisions*, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions". **Dollis v. Rubin**, 77 F.3d 777, 781-82 (5th Cir. 1995) (emphasis added). "'Ultimate employment decisions' include acts 'such as hiring, granting leave, discharging, promoting, and compensating.'" **Mattern v. Eastman Kodak Co.**, 104 F.3d 702, 707 (5th Cir.) (quoting **Dollis**, 77 F.3d at 782), *cert. denied*, 522 U.S. 932 (1997).

Our court has suggested that the ultimate employment decision requirement may not apply with respect to disparate treatment, as opposed to retaliation, claims. *See, e.g.,* **Shackelford**, 190 F.3d at 406-07; **Burger v. Cent. Apartment Mgmt., Inc.**, 168 F.3d 875,

33

878-79 (5th Cir. 1999); *Mattern*, 104 F.3d at 708-09 (noting the limited scope of Title VII's anti-retaliation provision when compared to other Title VII provisions). The fact remains, however, that *Dollis*, which involved disparate treatment (as well as retaliation), made no such distinction.

Our court has also implied that the continuing vitality of the "ultimate employment decision" doctrine is questionable in the light of *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). *See Fierros v. Tex. Dept. of Health*, 274 F.3d 187, 192 n.2 (5th Cir. 2001) ("*Burlington Industries* and *Faragher* are noteworthy in the context of this court's 'ultimate employment decision' doctrine because the Supreme Court sets out a relatively broad definition of 'tangible employment action': 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits'".).

In any event, for qualified immunity purposes, the test is whether Carter has asserted deprivation of a statutory right *under clearly established law*. *Dollis* is the one clear pronouncement on the matter.

(a)

Of the following complained-of incidents within the relevant period, the *January through July 1996 investigation* regarding the

34

credit card and TAL records *cannot* constitute an ultimate employment decision.  As noted, Thomas' primary involvement in the investigation was preparation of his 17 January 1996 memo — outside the limitations period.  In any event, the investigation had "mere tangential effect on a possible future ultimate employment decision", *Mattern*, 104 F.3d at 708:  namely, a five-day suspension following the hearing at which Carter *admitted* placing approximately 900 minutes of personal calls at the State's expense and agreed to reimburse it for them.

(b)

For the *promotion-denial for the June 1997 Hunter Safety Coordinator vacancy*, the district court found no evidence of pretext and granted the Department summary judgment.  As noted, it opined that Carter's complaint was "with the [State Personnel] Board and not the Department".  *Felton II*, at 13.  Nevertheless, that denial might constitute an ultimate employment decision.

Carter has not, however, demonstrated any involvement by Thomas.  As the district court noted, the *Department* made the decision not to promote Carter.  *Id.* at 12.  When pressed on this point at oral argument, Carter's counsel stated:  "[T]he point is that the well was poisoned [when Carter] went to apply for that position.  He wasn't allowed to get it because he had all this stuff in his record *from Thomas*".  (Emphasis added.)

35

We assume counsel was referring primarily to the investigation (and possibly Thomas' resulting 17 January 1996 memo) regarding the credit card and TAL records, culminating in the July 1996 hearing and resulting disciplinary action, including the written reprimand. In any event, **Mattern** held: "[H]aving documented reprimands in [plaintiff's] file may have increased the chance that she would *eventually* suffer an adverse employment action but, ... neither were they ultimate employment decisions nor did they rise above having mere tangential effect on a possible future ultimate employment decision". ***Id.*** at 708. "To hold otherwise would be to expand the definition of 'adverse employment action' to include events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee — anything which might jeopardize employment in the future." ***Id.***

(c)

The *23-24 March 1996 leave-denial* may be an ultimate employment decision. It appears, however, that Carter's accrued leave was not taken away; its use was merely postponed. In any event, the leave-denial was not *objectively unreasonable*. As Carter acknowledges in his brief, "no officers were allowed leave".

(d)

The final claimed discriminatory conduct is the *March 1997 low performance evaluation*, which resulted in Carter's being placed on a performance improvement plan and the loss of approximately one-

36

month's wage increase. Of course, placement on a performance improvement plan is not, by itself, an ultimate employment decision. *See **Mattern***, 104 F.3d at 708 ("[B]eing placed on 'final warning'[] do[es] not constitute [an] 'adverse employment action[]'".). On the other hand, *Thomas' counsel conceded* at oral argument that, under Department policy, participation in the plan automatically postponed Carter's scheduled annual raise.

Assuming that the raise-postponement *did* constitute an ultimate employment decision (again, the loss amounted to only *approximately $25*), it is important to note that, with the possible exception of Thomas' claimed inability to contact Carter during duty hours, Carter does *not* dispute the underlying bases for the evaluation, which are supported by the summary judgment evidence: low ticket issuance, erroneous TAL reporting, and failure to return forms. Accordingly, there was no objectively unreasonable conduct.

2.

Carter's § 1983 claim against Thomas for violation of "constitutional rights ... secured pursuant to the 5th Amendment and 14th Amendment" is *presumably* an equal protection claim. Carter, however, does not mention either Amendment in his brief; therefore, obviously, he does not mention equal protection.

To the extent an equal protection claim might reach the same conduct for which we have already recognized qualified immunity against the § 1981 claims, Carter has failed to make the requisite

37

showing.  "We do 'not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs'".  *Pierce*, 117 F.3d at 872 (internal citations omitted; quoting *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992)).

## B.

*Regarding Miller*, the only claim recognized by the district court is under § 1983 for deliberate indifference.  *Felton I*, at 12-13.  It held:  "Although Carter has offered evidence suggesting that Miller may have been aware of racial bias and discrimination by Thomas, the evidence fails to demonstrate discriminatory intent on behalf of Miller".  *Id.* at 12.  As noted, the court also recognized, however:  "[A]ccording to the Fifth Circuit, a supervisor may be liable under § 1983 if 'that official, by action or inaction, demonstrates a deliberate indifference to a plaintiff's constitutionally protected rights'".  *Id.* at 12-13 (quoting *Southard*, 114 F.3d at 551).  In that light, the court concluded:  "Because Carter has presented sufficient evidence to create a genuine issue as to whether Miller was aware of racial discrimination and did nothing to prevent it, he is not entitled to qualified immunity...."  *Id.* at 13.

For such liability, however, the supervisor's conduct must have caused a constitutional injury.  *See* *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 454-55 (5th Cir.) (en banc), *cert. denied*, 513

38

U.S. 815 (1994).  There are none here.  Accordingly, Miller is entitled to qualified immunity.

III.

For the foregoing reasons, the denial of qualified immunity from the §§ 1981 and 1983 claims against Thomas and Miller, in their individual capacities, is **REVERSED** and this case is **REMANDED** for further proceedings consistent with this opinion.

*REVERSED and REMANDED*