Linda **BATES**, Debi Dansbe, Casi Doughty, Leslie Dupuy, and Beverly Echols, Plaintiffs,

v.

**UNIVERSITY OF TEXAS MEDICAL BRANCH and Leon Clements, individually and in his official capacity as Chief Administrative Officer of Correctional Managed Care and Associate Vice President for Managed Care, Defendants.**

No. CIV.A.G–02–615.

United States District Court, S.D. Texas, Galveston Division.

Dec. 18, 2003.

Melissa Moore, Moore & Associates, Houston, TX, William Joseph Terry, Terry and Terry, Angleton, TX, for Plaintiffs.

Nancy K. Juren, Office of the Texas Attorney General, General Litigation, David Earl Jenkins, David E. Jenkins Office of the Attorney General, Austin, TX, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND

KENT, District Judge.

In this employment discrimination case, five Plaintiffs bring claims against Defendants University of Texas Medical Branch ("UTMB") and Leon Clements ("Clements"), alleging that Defendants discriminated against them by denying pay raises and job reclassifications on the basis of gender, race, age, and disability, that Defendants retaliated against Plaintiffs for exercising their First Amendment rights, and that Clements intentionally inflicted emotional distress on Plaintiffs. Now before the Court come the Motion for Judgment on the Pleadings of Defendants UTMB and Leon Clements in His Official Capacity, Leon Clements' Motion for Summary Judgment Based on Qualified Immunity, and Plaintiffs' Motion for Leave to Amend Pleading. For the reasons stated below, the Motion for Judgment on the Pleadings of Defendants UTMB and Leon Clements in His Official Capacity is hereby

**GRANTED**, Leon Clements' Motion for Summary Judgment Based on Qualified Immunity is hereby **GRANTED**, and Plaintiffs' Motion for Leave to Amend Pleading is hereby respectfully **DENIED**.

I. Background

Plaintiffs Linda Bates ("Bates"),[1] Debi Dansbe ("Dansbe"), Casi Doughty ("Doughty"), Suzanne Ducate, M.D., Leslie Dupuy ("Dupuy"), Beverly Echols ("Echols"), and Lois Kemp (collectively "Plaintiffs") are employed by UTMB in various capacities. Defendant Clements is chief administrative officer of Correctional Managed Care and associate vice president for managed care for UTMB. Plaintiffs level a variety of charges against UTMB and Clements, in his individual and official capacities, all of which relate to the management of the Correctional Managed Care division of UTMB during the fall of 2001 and the spring of 2002. Plaintiffs complain generally of disparate treatment with regard to raises and reclassifications, unfair discriminatory practices based on race, age, and gender, intentional infliction of emotional distress, and, finally, retaliation for filing internal charges of discrimination and formal EEOC charges. As an aid for the interpretation of each Plaintiff's individualized allegations, the Court offers a brief overview of the relevant personnel processes within UTMB's Correctional Managed Care department.

Several Plaintiffs complain about discriminatory pay raises during the relevant period. Since 1998, UTMB Correctional Managed Care has measured the performance of each of its units and regions using a performance audit system known as Operational Performance Evaluation System ("OPES"). After the audit is completed, each unit is ranked according to its relative performance, and a certain amount of money is allocated to each unit according to its ranking. Distribution of OPES increases to individual employees is determined by the Unit Management Team. These OPES raises are equivalent to performance-based raises in the private sector. In order for an individual employee to receive an OPES raise, the department head must submit a recommendation to the Human Resources Department ("HRD").

Each year, UTMB Correctional Managed Care sets a maximum percentage rate to determine the maximum raise that an individual employee may receive. This maximum percentage was 4.3% in 2001, the period relevant to Plaintiffs' claims. The OPES guidelines provide for OPES raises in excess of the maximum percentage rate; however, such an increase requires justification based on specific performance-based criteria. In other words, the department head must give a justifiable reason based on exceptional performance by the individual employee before Human Resources will approve an OPES raise in excess of the maximum percentage rate. OPES raises in excess of the maxi-

---

**1.** The Court notes that, on September 24, 2003, Defendants filed a Suggestion of Death Upon the Record regarding the untimely death of Plaintiff Linda Bates. Rule 25 of the Federal Rules of Civil Procedure provides that, upon motion of any party or the successors or representatives of the deceased party, the Court may order substitution of the proper parties. *See* Fed.R.Civ.P. 25. If such motion is not filed "[within] 90 days after the death is suggested on the record by service of a statement of the fact of the death ... the

action shall be dismissed as to the deceased party." *Id.* Though no motion for substitution has been filed, the 90-day period has not passed. Furthermore, several of Ms. Bates's claims are now suitable for disposition. The Court therefore addresses those claims properly before it, but the Court notes that any interested persons must file a motion for substitution not later than December 23, 2003, or Ms. Bates's remaining claims shall be dismissed.

mum percentage rate also depend on the existence of a sufficient amount of money in the requesting department's OPES allocation.

Several Plaintiffs complain that they were improperly denied job reclassifications by Defendants. UTMB maintains a standard set of job classifications based on job duties and responsibilities. The job reclassification process is initiated by the affected employee's supervisor, who forwards the reclassification request to the HRD. The HRD bases its analysis of reclassification requests on the principles of the Hay system. If the Hay system analysis shows that reclassification is appropriate, the job is reclassified within UTMB's own classification system. Defendants state that John Pemberton, the head of HRD, is the final authority for most reclassification decisions, though any reclassification request that will significantly increase the affected department's budget must be reviewed and approved by Clements.

## A. Linda Bates

Plaintiff Linda Bates has been employed as a Responsible Psychotherapist assigned to central administration since 1999. On September 5, 2001, Bates filed a grievance with UTMB/CMC's Office of Equal Opportunity and Diversity ("Affirmative Action Office"). The grievance alleged that Bates was one of the lowest-paid members of mental health services management and that she was denied a salary increase in July 2001 despite having taken on additional work responsibilities. Bates alleges

that Clements intentionally delayed the investigation of Bates's charge of discrimination, fostering an environment of unequal treatment and retaliation.[2]

In December 2001, Bates's supervisor requested an annual OPES raise of 8% for Bates. Plaintiff claims that Bates's supervisor sent proper justification for the raise.[3] Bates's OPES raise was eventually reduced to 4.3%. Despite this reduction, the raise was erroneously entered by HRD staff in the amount originally requested. The error was subsequently corrected, and the raise was reduced to 4.3%. Clements asserts that Pemberton made the decision to reduce the proposed OPES increases and that Clements played no part whatsoever in the entry of Plaintiffs' 2001 OPES pay increases. Bates alleges that her supervisor submitted a reclassification request on her behalf to the human resources department in December 2001, but the reclassification was not approved until nine months later. Even after it was approved, Bates alleges that it was never implemented. On January 8, 2002, Bates filed a charge of discrimination with the EEOC.

## B. Debbie Dansbe

Debbie Dansbe is currently employed as a human resource representative for UTMB managed care. Dansbe filed an internal charge of discrimination with UTMB's Affirmative Action Office on September 12, 2001. Her internal charge claimed that she had been discriminated against on the basis of disability and physi-

**2.** Defendants respond that the delay in the investigation of the grievances filed by Bates and the other Plaintiffs resulted from an urgent investigation into an egregious but unrelated claim of sexual harassment, which was pending at the time the grievances were filed.

**3.** Defendants respond that the reclassification requests submitted for Bates, Dupuy, and

Echols did not include proper performance-based justification; rather, they were justified by the fact that Plaintiffs had taken on more job duties. Defendants claim that the supervisor who submitted the requests was contacted and asked to provide performance-based justifications.

cal appearance. Dansbe's claim rested on comments allegedly made by Clements about her appearance, as well as the fact that she did not receive the promotion that she applied for in the summer of 2001. The grievance requested that she be compensated equally to other employees and that she not be retaliated against.

Dansbe alleges that she has been and continues to be a victim of retaliation for filing this charge. Dansbe further alleges that Clements intentionally delayed the investigation of Dansbe's complaint, fostering an environment of unequal treatment and retaliation. Dansbe filed a charge of discrimination with the EEOC on September 1, 2003. In her EEOC charge, Dansbe asserted claims of age discrimination, disability discrimination, and gender discrimination based on the alleged denial of a requested pay raise. Dansbe alleges that, because Clements has "the ultimate power and authority in the managed care branch of UTMB," she has "an acute fear of further retaliation and continued discriminatory and derogatory behavior based upon her past experiences involving Clements," and she suffers from "stress and fear because she exercised her protected rights." Plaintiffs' Exhibit 2.1 at 13:13–19, 21:10–22.

## C. Casi Doughty

Casi Doughty has been employed since May 24, 2003, as a Cluster Practice Manager for UTMB in Beaumont, Texas. Before she took her current position, Doughty was the Training Manager/Coordinator for the Department of Education and Professional Development for UTMB managed care.

In August 2001, Doughty's supervisor met with Clements to request a reorganization of the department and a salary increase for Doughty and two other employees. During this meeting, Clements stated that there was not enough money in the budget to grant salary increases.[4] Plaintiff claims, however, that male employees at UTMB received salary increases during 2001. After the request was denied, Doughty requested a meeting with Clements, during which she asked for a raise from $65,000 to $75,000 based on the salaries of other department heads. Doughty alleges that "Clements laughed and said, 'And you think you are worth more than that? ... I seriously doubt that we can ever get you that much.'" Plaintiff's Original Complaint ¶ 43.[5]

Doughty filed an internal charge of discrimination with UTMB's Affirmative Action Office on September 13, 2001. She alleges that she has been and continues to be the victim of retaliation for filing this charge. She alleges further that Clements intentionally delayed the investigation of her charge, thus fostering an environment of unequal treatment and retaliation. Doughty requested a meeting with Clements to discuss his expectations of her job

---

**4.** In addition to the budget shortfall of approximately $8 million that existed at the time of this request, Defendants argue that Clements did not consider Doughty's position to be equal to the position to which she compared it for purposes of the salary increase request. *See* Affidavit of Leon Clements, Defendants' Exhibit 6.2, at ¶ 8. Defendants also claim that Clements surveyed two other companies providing similar services to UTMB's Correctional Managed Care division and determined that Doughty's salary was higher than the salary paid by both outside companies. *Id.*

¶ 9. Finally, Defendants claim that a recently completed Hay study of all salaries and positions for UTMB and its competitors had not shown Doughty's salary and position to be out of line. *Id.*

**5.** Not surprisingly, Defendants cast the meeting in a more positive light, stating that "Clements explained to Doughty that since she had filed her grievance they should avoid further conversations, and that he would change her reporting relationship." Motion for Summary Judgment at 13.

performance, and they met on September 28, 2001. Doughty alleges that during this meeting, Clements stated that he was not willing to discuss job expectations "because he was not sure what he was going to do with Doughty because of what Doughty had done," that is, filed a discrimination charge. Plaintiffs' Response and Opposition to Leon Clements' Motion for Summary Judgment 8. Doughty also alleges that Clements told her that he knew that she and other females had filed charges of discrimination against him. Clements allegedly told Doughty that he expected "that" (complaints of discrimination) out of the "others" but not from her because they had "a better rapport." *Id.* Doughty alleges that Clements threatened Doughty and the other Plaintiffs, stating that "they had done what they needed to do, now he would do what he needs to do." *Id.* Finally, Doughty alleges that at the close of the meeting, Clements moved Doughty under his supervision.

Shortly after the September 28 meeting, Doughty withdrew her discrimination charge. On October 16, 2001, however, she filed an amended charge reinstating her original discrimination claim and adding a charge of retaliation based on her meeting with Clements. Doughty alleges that she has suffered "a number of instances of retaliation at the hand of Clements" as a result of her amended charge. *Id.* Doughty filed a formal charge of discrimination with the EEOC on January 8, 2002.

### D. Leslie Dupuy

Leslie Dupuy is currently employed as the Assistant Director of Mental Health Services for UTMB managed care. In May 2001, Dupuy submitted a request for job reclassification through her supervisor. Her position was not reclassified until 2002, and she complains that UTMB granted a similar reclassification request to a co-worker, Tom Wooldridge, in less than six months. Dupuy also complains that Wooldridge was given a higher salary increase with his reclassification than she received.[6] Dupuy also complains that, in December 2001, her supervisor requested an annual OPES raise of 9.27% for her. She claims that the OPES raise was cut to 4.3% (the maximum under the OPES guidelines) by Clements even though her supervisor submitted proper justification.[7] Despite this reduction, the raise was erroneously entered by HRD staff in the amount originally requested. The error was subsequently corrected, and the raise was reduced to 4.3%. Clements asserts that Pemberton made the decision to reduce the proposed OPES increases and that Clements played no part whatsoever in the entry of Plaintiffs' 2001 OPES pay increases.

Dupuy further alleges that Clements's animosity toward her and other Plaintiffs "has fostered an environment where their respective departments are ignored and on many levels made it impossible for them to perform essential job functions." *Id.* at 11. Specifically, Dupuy claims that she was denied access to payroll records that were necessary for her to properly budget

---

6. Defendants claim that the decision of whether and how to reclassify Dupuy was left to the discretion of HRD Director Pemberton. Affidavit of John Pemberton, Defendants' Exhibit 7.1 ¶¶ 4, 8.

7. As noted above, Defendants assert that Plaintiffs' supervisor failed to submit proper

performance-based justifications for their 2001 OPES pay increases. Defendants also note that Dupuy's 5% reclassification raise and 4.3% OPES increase amounted to a total increase of 9.3%, a figure "relatively close to the 10.5% increase that Mr. Wooldridge received." Motion for Summary Judgment at 17.

her department's expenditures. She alleges that a salary request she submitted for one of her subordinates was denied in December 2001. According to Dupuy, "[i]t was subsequently determined that as long as Dupuy's name was on the salary request for this individual, Clements would not approve it."[8] Dupuy claims that the same salary increase was later submitted by another supervisor and "was approved once Dupuy's name was removed from the request." *Id.* Dupuy alleges that in January and February of 2003, she was not permitted to attend two budget and staffing proposal meetings, though it was her job to prepare a proposal for the mental health services department. Finally, Dupuy alleges that her supervisor "told her on several occasions that he intentionally kept her name out of documents read by Clements because it is 'safer' that way." *Id.*

Dupuy filed an internal charge of discrimination with UTMB's Affirmative Action Office on September 6, 2001. She alleges that, as a result of her charge of discrimination, she became and continues to be the victim of retaliation. She alleges that Clements intentionally delayed the investigation of her internal charge of discrimination, "fostering an environment of unequal treatment and retaliation." *Id.* at 9. Dupuy filed a charge of discrimination with the EEOC on January 9, 2002.

### E. Beverly Echols

Beverly Echols is currently employed as a Patient Liaison in the Mental Health Services department of UTMB, a position she has held since 1993. In the summer of 2001, Echols was assigned additional duties by her supervisor. With the increase in duties, her supervisor requested that Echols receive a 10% raise. Shortly thereafter, her supervisor submitted a job reclassification request. Both were denied.[9]

Following the denial of the reclassification and raise requests, Echols filed an internal charge of discrimination with UTMB's Affirmative Action Office on September 5, 2001. She alleges that she has been subjected to retaliation for filing a discrimination charge. She alleges further that Clements intentionally delayed the investigation of her internal discrimination charge, "fostering an environment of unequal treatment and retaliation." *Id.* at 12. Echols alleges that Clements's animosity toward herself and other Plaintiffs "has fostered an environment where their respective departments are ignored on many levels and on many levels made it impossible for them to perform essential job functions." *Id.* at 13. Echols claims specifically that she was denied access to documents essential to her job, including documents regarding "vacancies and salary information of other employees." *Id.*

In December 2001, Echols's supervisor recommended an annual OPES raise of 9.58% for Echols. Echols was approved for only a 4.3% OPES increase. Echols claims that her supervisor submitted proper justification for the raise.[10] The raise was erroneously entered by HRD staff in the amount originally requested. The error was subsequently corrected, and the raise was reduced to 4.3%. Defendant as-

---

**8.** In support of this "determination," Plaintiff Dupuy cites a memorandum, handwritten on Harbor House stationery, of someone's account of the refusal to grant a salary increase to Dupuy's subordinate.

**9.** Defendants claim that the decision of whether and how to reclassify Echols was left to the discretion of HRD Director John Pemberton. Affidavit of John Pemberton, Defendants' Exhibit 7.2 ¶¶ 4, 10–11.

**10.** As noted above, Defendants assert that Plaintiffs' supervisor failed to submit proper performance-based justifications for their 2001 OPES pay increases.

serts that Pemberton made the decision to reduce the proposed OPES increases and that Clements played no part whatsoever in the entry of Plaintiffs' 2001 OPES pay increases. Echols filed a charge of discrimination with the EEOC on January 8, 2002.

Echols submitted a reclassification request in June 2002. She complains that after the reclassification was under review "for a long period of time," *Id.* at 13,[11] her request was denied. Echols complains further that the job description that she submitted in support of her reclassification request had been "significantly altered, including the deletion of significant job duties," *id.*, with the result that "her true job duties and skills were not reviewed as part of her reclassification." *Id.*[12]

\* \* \* \* \* \*

On October 19, 2001, Melvin Williams ("Williams"), the Director of UTMB's Office of Equal Opportunity and Diversity, wrote to each Plaintiff acknowledging receipt of their grievances and asked Clements to respond. After Clements responded, Williams informed Plaintiffs that he would contact them to set individual appointments. Plaintiffs refused to meet with Williams without an attorney present. Williams informed Plaintiffs that he would allow them to have an attorney present, although it was not UTMB's normal procedure. Williams asked that Plaintiffs contact him with a convenient time if they wished to pursue their grievances. Apparently, the Parties could not agree on dates

for Plaintiffs' appointments. When Williams received notice that Plaintiffs had filed charges with the EEOC that were similar in substance to their internal grievances, he assumed that Plaintiffs had determined to resolve their complaints through an outside agency, and he did not make further attempts to resolve the grievances internally.

In addition to their individualized allegations, all Plaintiffs complain of the actions of UTMB officials at meeting at the EEOC office. On April 9, 2002, Plaintiffs, UTMB attorney Chris Johnsen, CMC Human Resources Department Director John Pemberton, and Melvin Williams, the Director of UTMB's Office of Equal Opportunity and Diversity, attended a fact-finding conference at the EEOC's Houston office. Plaintiffs allege that at the meeting, Dansbe reasserted her claims and spoke about the retaliation she suffered. Plaintiffs allege that they were subjected to "inappropriate and at times an abusive environment as Mr. Johnsen and Mr. Williams continually raised their voices, made facial grimaces, and rolled their eyes at Plaintiffs' claims." Plaintiffs' Response at 10. That this meeting was a less than convivial affair is evident from Plaintiffs' allegation that the meeting ended "with Mr. Johnsen shouting that the Plaintiffs had wasted his time." *Id.* The Court notes that Clements was not present at the EEOC fact-finding conference.

Plaintiffs filed their Original Complaint on August 26, 2002, asserting the following

---

11. The summary judgment evidence cited by Echols in support of this claim indicates that her request was denied in writing on July 1, 2002. Plaintiff's Exhibit 5.5.

12. The written denial, cited by Plaintiff Echols, indicates that she did not meet the minimum educational qualifications for the requested reclassification. The memorandum indicated, however, "Since she is in the process of completing her Masters Degree, we

are prepared to revisit the request for reclassification ... upon completion of educational requirements and appropriate licensure, as required by the job description." Plaintiff's Exhibit 5.5. The memorandum indicates that UTMB denied Echols's request because she had not completed her Master's Degree. It is not clear from Echols's submissions how the allegedly altered job description figured in the reclassification analysis.

claims: (1) gender discrimination by UTMB in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), as well as the Reconstruction Civil Rights Act, 42 U.S.C. § 1981; (2) age discrimination by UTMB against Plaintiff Dansbe in violation of Title VII and § 1981; (3) race discrimination by UTMB against Plaintiff Echols in violation of Title VII and § 1981; (4) retaliation by UTMB against Plaintiffs for reporting discrimination in violation of Title VII and § 1981; (5) retaliation against Plaintiffs' exercise of free speech rights by UTMB and Clements, in his individual and official capacities, in violation of 42 U.S.C. § 1983; (6) retaliation against Plaintiffs' exercise of free speech rights by UTMB and Clements, in his individual and official capacities, in violation of the First Amendment to the United States Constitution; (7) discrimination by UTMB against Plaintiff Dansbe in violation of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12102 *et seq.;* and (8) intentional infliction of emotional distress by UTMB and Clements, in his individual and official capacities. As a result of the damages they have allegedly suffered from Defendants' unlawful behavior, Plaintiffs claim compensatory and punitive damages.

On June 27, 2003, Defendants filed their Motion for Judgment on the Pleadings on the following claims: (1) Plaintiffs' gender discrimination claims against UTMB under § 1981; (2) Plaintiff Dansbe's age discrimination claims against UTMB under Title VII and § 1981; (3) Plaintiff Echols's race discrimination claims under § 1981; (4) Plaintiffs' § 1983 free speech claims against UTMB and Clements in his official capacity; (5) Plaintiffs' claims against UTMB and Clements under the United States Constitution for violations of the First Amendment; (6) Plaintiff Dansbe's claims against UTMB under the Americans With Disabilities Act; (7) Plaintiffs' claims against UTMB for punitive damages under Title VII; and (8) Plaintiffs' IIED claims against UTMB and Clements in his official capacity. Plaintiffs filed a timely Response to Defendants' Motion for Judgment on the Pleadings, which incorporated their Motion for Leave to File Amended Complaint.

Also on June 27, 2003, Defendant Clements filed his Motion for Summary Judgment Based on Qualified and Official Immunity on the following claims asserted against him in his individual capacity: (1) Plaintiffs' First Amendment claims under § 1983; (2) Plaintiff Echols's race discrimination claims under § 1981; (3) Plaintiffs' IIED claims.

## II. Judgment on the Pleadings

Defendants' Motion for Judgment on the Pleadings depends almost entirely on the State's sovereign immunity to suit in federal court. The Supreme Court's recent jurisprudence has made abundantly clear that the United States Constitution preserves the basic framework of sovereign immunity. "The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court." *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001). The Supreme Court has long held that "the Constitution does not provide for federal jurisdiction over suits against nonconsenting states." *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 73, 120 S.Ct. 631, 640, 145 L.Ed.2d 522 (2000). Accordingly, if the State of Texas and, ultimately, UTMB enjoy sovereign immunity, this Court lacks jurisdiction over Plaintiffs' claims.

Whether a state university enjoys sovereign immunity depends on its status under state law. *See, e.g., Laxey v. La. Bd. of Trs.,* 22 F.3d 621, 623 (5th Cir.1994) ("Public universities may qualify

for immunity ... depending on their status under state law and their relationship to state government." (quotations omitted)). As a component institution of the University of Texas System, *see* Tex. Educ.Code Ann. § 65.02(a)(8) (Vernon 2002), UTMB enjoys the same sovereign immunity as the State of Texas itself. *See Perry v. Tex. A & I Univ.*, 737 S.W.2d 106, 108 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) ("Branches of the University of Texas and other state universities are agencies of the state and thus are entitled to the same governmental immunity from suit or liability as the State of Texas." (citing *Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 298 (Tex.1976))). Plaintiffs' claims against UTMB are thus equivalent, for purposes of sovereign immunity, to claims against the state of Texas.

■ The Eleventh Amendment also bars suit against state officials when the state itself is the real party in interest. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01, 104 S.Ct. 900, 908–09, 79 L.Ed.2d 67 (1984). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the state itself." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) (internal citations omitted). Accordingly, Plaintiffs' claims against Clements in his official capacity are equivalent to claims against the state itself. Because UTMB and Clements, in his official capacity, are within the scope of the Eleventh Amendment, Plaintiffs' claims are barred by sovereign immunity absent waiver, consent, or valid abrogation by Congress.

### A. Age Discrimination Claims

■ Plaintiff Dansbe asserts claims of age discrimination against UTMB under Title VII and 42 U.S.C. § 1981. Plaintiffs'

Original Complaint ¶ 116. Neither statute provides a cause of action for age-based discrimination. Title VII outlaws discrimination in employment based on an individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. Similarly, § 1981 does not prohibit age discrimination. *See Evans v. City of Houston*, 246 F.3d 344, 356 (5th Cir.2001) (noting that " § 1981 prohibits only racial discrimination"). Age discrimination claims are governed by the Age Discrimination in Employment Act (ADEA). *See* 29 U.S.C. §§ 621–634. The Supreme Court has held, however, that the ADEA does not abrogate the States' sovereign immunity. *See Kimel*, 528 U.S. at 91, 120 S.Ct. at 650. Because the State of Texas retains its sovereign immunity to claims under the ADEA, and because claims against UTMB and Clements in his official capacity are equivalent to claims against the State of Texas, Dansbe cannot state a claim for relief under the ADEA. Accordingly, granting Plaintiff's Motion for Leave to Amend to state a claim under the ADEA would serve no purpose. To the extent said Motion seeks leave to amend to state an ADEA claim, the Motion is hereby respectfully **DENIED**. Because neither Title VII nor § 1981 address age discrimination, Defendant's Motion for Judgment on the Pleadings is hereby **GRANTED**, and Dansbe's age discrimination claims are hereby **DISMISSED WITH PREJUDICE**.

### B. § 1983 Claims

■ Plaintiffs allege that UTMB and Clements "deprived Plaintiffs of their right to freedom of speech under the First Amendment" in violation of 42 U.S.C. § 1983, which creates a civil action against a state official who, under color of state law, deprives a person of rights guaranteed by the United States Constitution. Section 1983 does not, however, abrogate

state sovereign immunity. *See Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 1146, 59 L.Ed.2d 358 (1979) ("[N]either logic, the circumstances surrounding the adoption of the Fourteenth Amendment, nor the legislative history of the 1871 Act compels, or even warrants, ... the conclusion that Congress intended by the general language of the Act to overturn the constitutionally guaranteed immunity of the several States."). Furthermore, governmental entities and governmental officials acting in their official capacity do not constitute "persons" within the meaning of § 1983. *Will,* 491 U.S. at 71, 109 S.Ct. at 2312 ("[N]either. a state nor its officials acting in their official capacities are 'persons' under § 1983."); *Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (reaffirming *Will*'s holding that, because an official-capacity suit is equivalent to a suit against the state, a state officer sued for money damages in his or her official capacity is not a "person" under § 1983). The State of Texas has not waived its sovereign immunity to suit in federal court for § 1983 claims. *See Aguilar v. Tex. Dept. of Criminal Justice,* 160 F.3d 1052, 1054 (5th Cir.1998). Because Plaintiffs' claims against UTMB and Clements in his official capacity are barred by sovereign immunity, the Court hereby **GRANTS** Defendants' Motion for Judgment on the Pleadings, and Plaintiffs' § 1983 claims are hereby **DISMISSED WITH PREJUDICE**.

### C. § 1981 Claims

■ Plaintiff Echols alleges that UTMB unlawfully discriminated against her based on her race in violation of 42 U.S.C. § 1981. Though Plaintiff seeks to amend her complaint to assert race-discrimination claims only against Clements in his individual capacity, Plaintiffs' proposed Second Amended Pleading retains the § 1981 claim against UTMB. It is sufficient to note that § 1981 does not abro-

gate the States' sovereign immunity. *See Jett v. Dallas Ind. Sch. Dist.,* 798 F.2d 748, 762 n. 13 (5th Cir.1986), *aff'd in part, remanded in part,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (citing *Sessions v. Rusk State Hosp.,* 648 F.2d 1066, 1069 (5th Cir.1981)). Accordingly, Echols cannot assert a claim against UTMB under § 1981. Defendants' Motion for Judgment on the Pleadings is hereby **GRANTED**, and Echols's § 1981 claim against UTMB is **DISMISSED WITH PREJUDICE**.

### D. ADA Claims

■ Plaintiff Dansbe alleges that UTMB intentionally discriminated against her because of her disability or perceived disability in violation of the Americans With Disabilities Act, thereby causing severe emotional distress, lost wages, and lost seniority and retirement benefits. Plaintiffs' Original Complaint ¶¶ 135–36. The United States Supreme Court has held, however, that the ADA does not abrogate state sovereign immunity. *See Bd. of Trs. of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). Because Dansbe's ADA claim against UTMB is barred by sovereign immunity, the Court **GRANTS** Defendants' Motion for Judgment on the Pleadings, and Dansbe's ADA claim is hereby **DISMISSED WITH PREJUDICE**.

### E. Claims Brought Directly Under the U.S. Constitution

■ Plaintiffs also attempt to assert their free speech claims directly under the Constitution. Plaintiffs' Original Complaint ¶¶ 138–42. Whereas the Supreme Court has recognized certain causes of action against *federal* officials arising directly under the Constitution, *see, e.g., Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)

(recognizing a cause of action against federal agents under the Fourth Amendment), claims against state officials are properly asserted through § 1983. *See Shelby v. McAdory,* 781 F.2d 1053, 1054 n. 1 (5th Cir.1986), *overruled on other grounds by St. Francis College v. Al–Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) ("[C]auses of action asserted directly under the constitution are appropriate only against federal agents."); *see also Burns–Toole v. Byrne,* 11 F.3d 1270, 1273 n. 3 (5th Cir.1994) (recognizing that § 1983 is the proper vehicle for First Amendment claims against state officials). Because no cause of action against state officials exists under the First Amendment, Defendants' Motion for Judgment on the Pleadings is hereby **GRANTED,** and Plaintiffs' claim is **DISMISSED WITH PREJUDICE.**

### F. Punitive Damages Under Title VII

■ Plaintiffs pray for punitive damages against UTMB on their Title VII claims. Defendants correctly point out, however, that Title VII clearly precludes punitive damage awards against governments, government agencies, and political subdivisions. *See* 42 U.S.C. § 1981a(b)(1) ("A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) . . . ."); *see also Oden v. Oktibbeha County, Miss.,* 246 F.3d 458, 465–66 (5th Cir. 2001) (holding that assessment of punitive damages in a Title VII claim against a sheriff constituted plain error and reversing the award even though the appellants failed to properly preserve their objection). Because of the clear prohibition of punitive damage awards against state agencies and state officers in their official capacity, Plaintiffs cannot recover punitive damages under Title VII. Accordingly, the Court **GRANTS** Defendants' Motion for Judgment on the Pleadings, and Plaintiffs' claim for punitive damages under Title VII is hereby **DISMISSED WITH PREJUDICE.**

### G. Intentional Infliction of Emotional Distress

■ Plaintiffs assert claims of intentional infliction of emotional distress against UTMB and Clements in his official capacity. Unless the Constitution or statutes of the State of Texas expressly waive sovereign immunity or the legislature grants permission to sue, the State of Texas, as well as its agencies and officials, are immune from suit. *See Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997) ("[S]overeign immunity, unless waived, protects the State of Texas, its agencies and its officials from lawsuits for damages, absent legislative consent to sue the State."); *Hosner v. DeYoung,* 1 Tex. 764, 769 (1847). Waiver of sovereign immunity requires clear and unambiguous language. *See Univ. of Tex. Med. Branch at Galveston v. York,* 871 S.W.2d 175, 177 (Tex. 1994). The Texas Tort Claims Act provides that the State's waiver of sovereign immunity does not extend to intentional torts. *See* Tex. Civ. Prac. & Rem.Code Ann. § 101.057(2) (Vernon 1997) ("This chapter does not apply to a claim . . . arising out of assault, battery, false imprisonment, or any other intentional tort . . . ."). Intentional infliction of emotional distress is, by definition, an intentional tort. *Cf. Boyles v. Kerr,* 855 S.W.2d 593 (rejecting negligent infliction of emotional distress as an independent cause of action). Because the State of Texas has not waived its sovereign immunity from claims of intentional infliction of emotional distress, Plaintiffs' claims are barred. Accordingly, the Court **GRANTS** Defendants' Motion for Judgment on the Pleadings, and Plaintiffs' claims of intentional infliction of emotional distress are hereby **DISMISSED WITH PREJUDICE.**

## III. Motion for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party must come forward with "specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e), *quoted in Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court must view all evidence in the light most favorable to the non-movant. *See, e.g., Broussard v. Parish of Orleans*, 318 F.3d 644, 650 (5th Cir.), *cert. denied, Dazet v. Foster*, 539 U.S. 915, 123 S.Ct. 2276, 156 L.Ed.2d 130 (2003). If the evidence would permit a reasonable fact finder to find in favor of the non-moving party, summary judgment should not be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

 Defendant Clements moves for summary judgment based on qualified and official immunity. The existence of qualified immunity presents a question of law. *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The qualified immunity analysis begins with a threshold inquiry: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). If so, "the next, sequential step is to ask whether the right was clearly established." *Id.* Because the facts alleged, taken in the light most favorable to Plaintiffs, do not show that Clements's conduct violated a constitutional right, the analysis need not proceed to the second step, and the Court finds that Clements is entitled to qualified immunity.

### A. First Amendment Claims

Plaintiffs' allege that Clements retaliated against them for filing personnel grievances and EEOC charges, thus violating their free speech rights under the First Amendment. As should be abundantly clear from the Court's recitation of the facts above, this case involves enough tit-for-tat disagreements about internal decisionmaking, salary decisions, promotions, and the like, to make an accurate and impartial reconstruction of the actual events all but impossible. Similarly, the Clerk of Court can attest that the summary judgment proof submitted in support of the Parties' intricate multilevel back-and-forth weighs enough to require a dolly for transport. But while this miasma of allegations, innuendo, and general contumacy shrouds a plethora of genuine fact issues, the law reveals that none of these fact issues are material and that Clements is entitled to summary judgment.

 To show a constitutional violation in a First Amendment-based retaliation claim, a plaintiff must allege facts showing (1) that the employee's speech involved a matter of public concern, (2) that the employee suffered an adverse employment action, (3) that the employee's speech was a motivating factor in the adverse employment action, and (4) that the employee's interest in speaking on a matter of public concern outweighs the employer's interest in efficiency. *See Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 366 (5th Cir.2000); *Teague v. City of*

*Flower Mound, Tex.*, 179 F.3d 377, 380 (5th Cir.1999). Because Plaintiffs' free speech claims fail to clear the first hurdle—that the speech involved a matter of public concern—they fail to show that Clements violated their constitutional rights.

Whether employee speech relates to a matter of public concern presents a question of law. *See Kennedy*, 224 F.3d at 366 (citing *Rankin v. McPherson*, 483 U.S. 378, 386 n. 9, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987)). The Court's analysis begins with the proposition that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee on matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). Shortly after *Connick*, the Fifth Circuit explained the scope and focus of the "public concern" inquiry: "Because almost anything that occurs within a public agency *could* be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee.... [T]he mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." *Terrell v. Univ. of Tex. System Police*, 792 F.2d 1360, 1362 (5th Cir.1986).

■■■■■ The Fifth Circuit has adopted two tests, both based on the Supreme Court's decision in *Connick*, to determine whether employee speech relates to a public concern. The first, called the "content-form-context test," provides that "[whether] an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole court record." *Kennedy*, 224 F.3d at 366 (quoting *Connick v. Myers*, 461 U.S. at 147–48, 103 S.Ct. at 1690). The second test, sometimes used in conjunction with the first, is the "citizen-employee test," which dictates that " 'when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest,' the employee's speech falls outside the parameters of speech involving matters of public concern." *Id.* (quoting *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690). The Fifth Circuit has noted that the citizen-employee test may produce indeterminate results because the mere existence of some personal interest on the employee's part does not necessarily mean that the speech at issue does not involve a public concern. *See id.* Some cases, in other words, involve "mixed" speech, which combines elements of public and private concern. In these mixed-speech cases, courts must analyze the speech at issue under the content-form-context test. *See Kennedy*, 224 F.3d at 366; *Teague*, 179 F.3d at 381.

It is not immediately apparent what type of speech is involved in the present case. The Court recognizes that work-related speech, particularly speech concerning one's position, compensation, and other conditions of employment, typically involves at least some element of private concern. The Court is inclined to believe that the "shorthand" analysis of the citizen-employee test, *see Kennedy*, 224 F.3d at 366, is more than adequate to resolve the issue, but in consideration of the posture of the present case, and recognizing that characterization of speech is a particularly sensitive matter, the Court cannot conclude at this point that Plaintiffs spoke solely as employees "upon matters only of personal interest." *See Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. The summary

judgment proof contains some indication, however minute, that Plaintiffs' speech concerned a general pattern of gender discrimination at UTMB. Therefore, out of an abundance of caution, the Court concludes that this is a mixed-speech case and that the content-form-context test is appropriate.[13]

Though the content-form-context test has proven to be a slightly unwieldy mechanism charged with resolving inherently difficult questions, Fifth Circuit precedent provides more than enough guidance to resolve the present case. The Circuit's decision in *Kennedy v. Tangipahoa Parish Library Board of Control* provides a comprehensive review and useful distillation of the Circuit's mixed-speech jurisprudence. With respect to the content of employee speech, the Circuit concluded in *Kennedy* that "the content of the speech may relate to the public concern if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government. If releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature." *Kennedy*, 224 F.3d at 372. With respect to form, "speech need not be made to the public, but it may relate to the public concern if it is made against the backdrop of public debate." *Id.* Finally, regarding context, "the speech cannot be made in furtherance of a personal employer-employee dispute if it is to relate to the public concern." *Id.*

*Kennedy* arose out of the widely publicized rape of a librarian in Independence, Louisiana. On the day of the rape, one of the two employees at the library left early,

and despite requests for a replacement, none came. A homeless man entered the library, raped the lone employee, threatened to kill her, and beat her severely. The man was apprehended shortly thereafter. The crime, and the lack of library security that it exposed, "left the community in an uproar" and "sparked intense media scrutiny and gossip." 224 F.3d 359, 361 (5th Cir.2000). The day after the crime, the Parish Council sent a letter to the Director of the Tangipahoa Parish Library asking how she planned to prevent similar crimes in the future.

After visiting the victim and speaking with another library employee, appellant Donna Kennedy, a manager of the Parish Library, became concerned that the director might downplay the event to protect the library's image. Concerned that this might jeopardize the safety of library employees, Kennedy wrote a letter suggesting policy changes and urging that the tragedy not be de-emphasized. Kennedy signed the letter "in her capacity as Automation Coordinator and Technical Services Supervisor," *id.* at 363, and mailed the letter to the members of the Board of Control and the Library's branch managers. Kennedy also showed a copy to the Director.

Roughly a week after the rape, the Board of Control held a meeting and, though library security was not on the agenda, one member pressed the issue, mentioning Kennedy's letter, and the Board adopted the Director's proposed ten-step security plan. The same day, the Director wrote a letter "demoting Kennedy and stripping her of her supervisory duties." *Id.* at 363–64. Kennedy did not learn of her demotion until 10 days after

**13.** Though the Court does not rely exclusively on the "shorthand" employee-citizen test, *Connick* and more recent First Amendment retaliation cases suggest that the question posed by the test—whether the employee spoke primarily as a citizen or as an employee—effectively states the ultimate goal of the content-form-context test.

the Director's decision. The Director fired Kennedy roughly one week later when she arrived at a meeting with a tape recorder and a witness.

Kennedy filed a grievance with the Library personnel committee. After the Board of Control upheld the personnel committee's decision in favor of the Director, Kennedy filed a lawsuit against the Director and the Library. During the litigation, the Director and the Board of Control conceded that the Director had demoted Kennedy in response to her letter. *Id.* at 364.

Concluding that Kennedy had spoken in her capacity as a citizen as well as her capacity as an employee, the Fifth Circuit characterized *Kennedy* as a mixed-speech case. In her capacity as a citizen, Kennedy's speech was motivated in part by a matter of potential public concern: "a fear that [the Director] and the Board were placing the public and Library employees, *other than herself,* in danger by downplaying the seriousness of the rape." *Id.* at 367 (emphasis added). Second, Kennedy spoke, in her capacity as a citizen, on a matter of active and specific public concern: "she spoke as an informed citizen on a topic that dominated the local media and against a background of vigorous public debate." *Id.* The Fifth Circuit noted, however, that Kennedy also spoke as an employee: "she signed the letter in her supervisory capacity, and she believed that speaking out about employee safety was part of her job as a supervisor and employee." *Id.*

*1. Content*

■ The content of an employee's speech may relate to the public concern "if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government." *Id.* at 372. In

*Gillum v. City of Kerrville,* the Fifth Circuit emphasized that the analysis of the content of employee speech is secondary to the broader question of the capacity in which the employee spoke. *Gillum v. City of Kerrville,* 3 F.3d 117, 120–21 (5th Cir. 1993) (stating that the First Amendment retaliation analysis does not "focus on the inherent 'importance' of the subject matter of the speech but on the extent to which the terminated employee spoke as a citizen or employee"). The Court elaborated:

> This focus is on the hat worn by the employee when speaking rather than upon the "importance" of the issue reflects the reality that at some level of generality almost all speech of state employees is of public concern. Relatedly, we are chary of an analytical path that takes judges so uncomfortably close to content based inquiries.

*Gillum,* 3 F.3d at 121. The above commentary does not suggest that the content of speech is unimportant but rather that content is important only insofar as it reveals the role in which the employee spoke.

■ The Fifth Circuit has found that some categories of speech inherently involve matters of public concern. For example, the Circuit has held that "speech regarding police misconduct constitutes a matter of public concern." *Teague,* 179 F.3d at 381; *see also Forsyth v. City of Dallas,* 91 F.3d 769, 773–74 (5th Cir.1996) ("The public would want to know of charges that influential citizens were taking advantage of their relationships with the police, even to the extent of conducting their own wiretaps."). Likewise, the Fifth Circuit has recognized an inherent public concern in race discrimination, *see Kennedy,* 224 F.3d at 369 (citing *Givhan v. Western Line Consolidated Sch. Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979)), and sexual harass-

ment. *See Wilson v. UT Health Ctr.,* 973 F.2d 1263, 1269 (5th Cir.1992). Plaintiffs argue that because their internal grievances included allegations of widespread gender discrimination at UTMB, their speech raised matters of public concern. Though these allegations are disputed by Defendants, the content of Plaintiffs' speech, viewed in isolation and in a light most favorable to Plaintiffs, relates to the public interest in the very general sense that the public is likely to be concerned about gender discrimination. Accordingly, the content of Plaintiffs' speech raises a slight public concern because it is not concerned with matters solely of personal interest.[14] Far from resolving the question, however, this leads to the more important factors of form and context. *See Teague,* 179 F.3d at 382 (noting that the focus on the speaker's capacity rather than the "importance" of the issue elevates form and context over content). The Circuit has cautioned that "[t]he mere insertion of a scintilla of speech regarding a matter of public concern" is not sufficient to "make a federal case out of a wholly private matter fueled by private, non-public interests." *Id.*

### 2. Form

 Fifth Circuit caselaw shows that the analysis of the form of the employee's speech focuses primarily on two factors: (1) the simple form or format of the speech; and (2) the speaker's motivation. The first component of the form analysis is perhaps the most obvious, focusing on the medium used by the speaker and the intended audience. Regarding the second factor, the cases suggest that some nexus must exist between the public concern implicated by the speech and the relief sought by the speaker. This comes down to a simple question in most cases: Does the employee seek only personal benefits, or does he or she seek a broader remedy that will serve the public interest? The medium and audience of Plaintiffs' speech, as well as the relief sought, show that their statements were exclusively private in form.

When an employee does not direct his or her complaints to the public, the speech is private in form. Plaintiffs spoke through internal grievances filed with the UTMB Affirmative Action Office and formal charges of discrimination filed with the EEOC. No other speech is involved in Plaintiffs' First Amendment retaliation claims. Plaintiffs chose to speak exclusively through mechanisms designed to resolve employees' complaints about the conditions of their employment. The nature of these mechanisms suggests that they were established for use by employees exclusively in their capacity as employees. It would be anomalous, for example, for an employ-

---

**14.** *Kennedy* suggests that the inquiry into the content prong of employee speech is less stringent than the content-form-context as a whole. The Circuit concluded that the content of speech may relate to the public concern "if it does not involve *solely* personal matters." *Kennedy,* 224 F.3d at 372 (emphasis added). The Circuit explained, however, that "the *Terrell* court restated our task in mixed speech cases as deciding 'whether the speech at issue in a particular case was made primarily in the plaintiff's role as citizen or primarily in his role as employee.'" *Id.* at 367–68 (quoting *Terrell,* 792 F.2d at 1362). The Circuit recognized that "a standard that requires employees to speak *primarily* as citizens is obviously far more stringent than one that asks only that employees speak on matters *not* solely of personal interest." *Id.* at 368. Accordingly, the content inquiry is less stringent than the overall test, which is geared toward determining the primary role of the employee. This distinction is not inconsistent, however, with the Circuit's conclusion in *Teague* that form and context are more important than content. *See Teague,* 179 F.3d at 382 (indicating the Circuit's "desire to elevate the roles of context and form over content").

ee to complain to the EEOC or the UTMB Affirmative Action Office about a public safety issue. It is not inconceivable that an employee might register a complaint about a matter of predominantly public concern with the EEOC, but it is difficult to imagine any response other than a polite suggestion to redirect the complaint. It is the very nature of these offices to encourage and receive speech from employees in their capacity as employees, not as concerned citizens. These offices are simply not designed to provide remedies affecting the general public. They are designed, rather, to provide private relief to individual employees on matters connected with their employment.

Likewise, the relief sought by Plaintiffs shows that their speech was intended only to secure benefits to themselves. In *Kennedy*, the Fifth Circuit found that the employee's speech related to a matter of public concern because it was motivated by "a fear that [the Director] and the Board were placing the public and Library employees, *other than herself*, in danger by downplaying the seriousness of the rape." *Id.* at 367 (emphasis added). The Circuit's language in *Kennedy* demonstrates that when the speaker is motivated by a matter of potential public concern not affecting her own employment conditions, such as a general threat of future harm to a group of fellow employees, the speech is public in form.

The Fifth Circuit also examines the relief sought by the speaker in determining whether the form of the speech is public or private. In *Teague v. City of Flower Mound*, two police officers were removed by the police chief from the investigation of a fellow officer suspected of aggravated perjury. The Chief of Police hired a private investigation firm to complete the investigation, and the officer was exonerated. Believing the exoneration to be unwarranted, the officers requested a meet-

ing with the Chief, who refused, stating that the district attorney had reached the same conclusion in an independent investigation. After learning that the district attorney had never conducted the investigation, the officers filed grievances. In response, the Chief transferred and eventually terminated the officers. *See Teague*, 179 F.3d at 379. One officer's grievance complained of his removal from the investigation and stated, "I believe I have exhausted all reasonable means to clear myself from those allegations which caused my removal from an otherwise routine internal affairs investigation." *Id.* at 383. The officers' joint grievance expressed "the need to be given a fair hearing concerning our handling of [the]investigation." *Id.* The Fifth Circuit expressly concluded that the officers' speech was "undeniably private in form" because "[t]heir focus ... was primarily on clearing their names—not on rooting out police corruption *per se.*" *Id.* Similarly, in *Gillum v. City of Kerrville*, the Circuit held that a police officer, who was terminated after complaining to his superior officers about police corruption, spoke primarily in his role as an employee and therefore did not state a federal claim. *Gillum*, 3 F.3d at 120–21. The Circuit reasoned that, although corruption in police affairs was a matter of public concern, the plaintiff's "focus was ... on the issue insofar as it impacted his wish to continue his investigation." *Id.* at 120. The Circuit concluded, "Although interspersed with apparently genuine concerns regarding police wrongdoing, Teague's and Burkett's grievances were primarily motivated by, and primarily addressed, concerns particular to their private interests." *Id.* at 383–84. *Teague* and *Gillum* show that, even when the topic of speech is clearly a matter of public concern, the speech is private if the speaker

is motivated by personal interests related to his or her own employment.

Plaintiffs spoke exclusively through internal mechanisms, choosing not to air their grievances to the public or to the media. Furthermore, Plaintiffs sought exclusively personal relief. Because the manner of Plaintiffs' speech, as well as the motivation behind it, clearly indicate that they spoke as employees, the Court concludes that the form of Plaintiffs' speech is wholly private.

### 3. Context

The context element of the *Connick* test focuses on the circumstances surrounding the speech in question. The ultimate question is whether the speech was "made in the setting of a private employee-employer dispute." *See Teague*, 179 F.3d at 383. "[T]he speech cannot be made in furtherance of a personal employer-employee dispute if it is to relate to the public concern." *Kennedy*, 224 F.3d at 372. Because their statements were unquestionably made in furtherance of a private employment dispute, the context of Plaintiffs' speech is exclusively private.

As noted above, Plaintiffs spoke through grievances and EEOC charges, mechanisms plainly intended to serve as channels for resolving employee-employer disputes. An employee's decision to file internal grievances does not resolve the question; however, it does suggest that the speech is private in context. *See Teague*, 179 F.3d at 383. Speech that is purely private in form may qualify as public-concern speech if the context shows a relation to a matter of active and articulated public concern. For example, in *Givhan*, the form of speech was private, but the teacher spoke against a background of active public debate on school desegregation and employment policies in her district. In fact, at the time that Givhan was terminated, her school district was the subject of a

desegregation order issued by a United States District Court. *Givhan*, 439 U.S. at 411, 99 S.Ct. at 694. The District Court concluded that she was terminated for criticizing the policies and practices of the school district, which she considered to be racially discriminatory. *Id.* at 413, 99 S.Ct. at 695. While Givhan's speech was private in form, the context of her statements showed an active and articulated public concern regarding racial discrimination in her school district, the very subject of her speech.

In *Moore v. City of Kilgore*, the Circuit relied specifically on the active interest of the local media in finding that the context of an employee' speech—a firefighter's "diatribe" to the media about a tragic accident, which he blamed on department staffing policy—implicated the public concern. *Moore*, 877 F.2d at 371. The Court remarked that, given the fact that the employee responded to questions from the local media, "the public was receptive and eager to hear about the ability of the Fire Department to perform its duties." *Id.* Like *Kennedy*, *Moore* illustrates that context—in each case an active and articulated public interest in events related to the speaker's job—can transform the speaker's role from a mere employee addressing a private matter to "an informed citizen regarding a matter of great public concern." *Id.* at 371; *cf. Kennedy*, 224 F.3d at 367 (finding that Kennedy "spoke as an informed citizen on a topic that dominated the local media and against a background of vigorous public debate").

The Fifth Circuit's decision in *Gillum v. City of Kerrville* illustrates the importance of context over content. *Gillum* instructs that, even where the content of speech relates to a topic of public concern, the speech itself is not a matter of public concern if it is "made in furtherance of a personal employer-employee dispute."

*Kennedy,* 224 F.3d at 372 (citing *Gillum,* 3 F.3d at 121). The present case turns on the same distinction. There is no doubt that, like police misconduct, discrimination by state agencies implicates the general public interest. But, as in *Gillum,* Plaintiffs' speech regarding UTMB and Clements's alleged discrimination arose in a private context—Plaintiffs spoke in furtherance of personal employment disputes. Unlike *Givhan* and *Moore,* nothing about the context of Plaintiffs' speech indicates that the public had an active interest in any matter connected with or related to the conditions of Plaintiffs' employment.

Plaintiffs' arguments, and the summary judgment proof submitted in support thereof, show that their claims present textbook examples of private employment disputes. Plaintiffs' allegations of First Amendment retaliation connect to a genuine matter of public concern only by Plaintiffs' own vague and unsubstantiated claims that they suffered from "widespread" gender discrimination. The grievances filed with UTMB, as well as the EEOC charges, allege that Plaintiffs were denied pay raises and/or promotions while other employees received higher pay or advancement. Plaintiffs' speech was geared solely toward securing increased compensation for themselves and not toward curing some institutional pathology within UTMB. Plaintiffs offer no evidence that the public had an articulated and active concern with gender discrimination in UTMB's Correctional Managed Care division. To be sure, the public interest is served incrementally when a single instance of discrimination is remedied. But the clear lesson of the Fifth Circuit's mixed-speech cases is that a plaintiff must show that her speech implicates a public concern broader than his or her own employment dispute in order to state a claim of First Amendment retaliation. Plaintiffs did not file their charges as crusaders for public justice but as individual employees seeking employment benefits to which they believed they were entitled.

■ In sum, the content of Plaintiffs' speech is marginally public, but the form and context are wholly private. The Court concludes, therefore, that Plaintiffs' speech is emphatically *not* the type of speech covered by the First Amendment.[15] Because Plaintiffs fail to show that Clements violated their First Amendment rights, the Court does not reach the second step of the qualified-immunity inquiry. Accordingly, Clements is entitled to qualified immunity against Plaintiffs' First Amendment claims, and Defendant's Motion for Summary Judgment is **GRANTED**, and Plaintiffs First Amendment retaliation claims are **DISMISSED WITH PREJUDICE.**

**15.** This conclusion does not mean that Plaintiffs, and others similarly situated, have no recourse against employer retaliation based on employee speech. Title VII provides a mechanism for employees to enforce their rights against their employers. Perhaps more to the point, it provides specific protection against retaliation for exercising those rights or, as is generally necessary to protect or assert a right, speaking out about their infringement. The Fifth Circuit has noted in similar circumstances that when a public employee "speaks as an employee on matters that address only his personal employment conditions, he is not protected from discharge for engaging in that speech by the First Amendment. This principle is especially compelling in cases where an employee's expressions are protected against retaliation under Title VII of the Civil Rights Act." *Ayoub v. Tex. A & M Univ.,* 927 F.2d 834, 837 (5th Cir.1991). To the extent that Plaintiffs' allegations raise a genuine matter of public concern regarding gender discrimination in the workplace, that concern has been addressed by the enactment of Title VII, which covers retaliation in private employer-employee disputes. The majority of Plaintiffs' claims under Title VII are in no way affected by Defendants' Motions or this Order.

## B. Race Discrimination Claim

At the outset, the Court notes that there is some dispute whether Plaintiff Echols asserts a claim of race discrimination against Clements in his individual capacity. Defendants suggest that Plaintiffs' Original Complaint does not assert claims under 42 U.S.C. § 1981 against Clements. *See* Motion for Summary Judgment at 36 (citing Plaintiffs' Original Complaint ¶¶ 113–19). Defendants suggest further that, even if Echols had asserted a § 1981 claim against Clements, such claim was not properly asserted under § 1983; therefore, she has failed to state a claim under § 1981. It is well-established that § 1983 provides the exclusive remedy against state actors for violations of rights guaranteed by § 1981. *See Jett v. Dallas Ind. Sch. Dist.,* 491 U.S. 701, 735, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) ("We hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."); *Felton v. Polles,* 315 F.3d 470, 481–83 (5th Cir.2002). Furthermore, the Fifth Circuit has expressly stated that "requiring § 1981 claims against state actors to be pursued through § 1983 is not a mere pleading formality." *Felton,* 315 F.3d at 482.

After careful examination of Plaintiffs' Original Complaint, the Court concludes that Plaintiff Echols fails to state a § 1981 claim against Clements for the simple reason that the complaint does not allege that Clements violated Echols' rights under § 1981. To the extent that the Complaint alleges a violation of § 1981, it states a claim only against UTMB. *See* Plaintiffs' Original Complaint ¶ 117. Moreover, Defendants correctly note that Echols fails to properly assert her § 1981 claim pursuant

to § 1983 as required by Fifth Circuit precedent. *See Felton,* 315 F.3d at 481–83.

Even if Echols had properly pleaded a claim of race discrimination against Clements in his individual capacity, Clements would be entitled to summary judgment. Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981. To establish a claim under § 1981, a plaintiff must allege facts showing that "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerns one or more of the activities enumerated in the statute [e.g., enforcement of a contract]." *Felton,* 315 F.3d at 483.

Because Echols is an African–American female, she meets the first element of § 1981. The summary judgment proof, however, reveals a lack of evidence to support the second element—intent to discriminate based on Echols's race. Echols makes the following allegations in support of her race discrimination claim: (1) she was denied a raise by Clements, allegedly because of budgetary constraints; (2) Tom Wooldridge, a white male employee, received a raise around the same time despite the fact that Echols had taken on some of his duties, *see* Deposition of Beverly Echols, Plaintiffs' Exhibit 5.1, at 59:12–24; (3) the only raises granted at this time were given to non-African-American employees; (4) Echols is the only African–American employee in management at Mental Health Services, *see id.* at 68:3–8; (5) Clements was unable to articulate

UTMB's policy regarding racial discrimination to any degree of certainty during his deposition, Plaintiffs' Response at 34 (citing Deposition of Leon Clements, Plaintiffs' Exhibit 6.1, at 102:25–103:6);[16] and (6) Clements stated that he was unaware that Echols was African–American until after she filed her EEOC charge, *see* Clements Deposition at 101:13–17, which Echols claims demonstrates "a conscious disregard for her legitimate complaints against him." Plaintiffs' Response at 34.

The Court draws a different conclusion from the evidence that Clements did not know that Echols was African–American. Clements's deposition testimony indicates that he was unaware that Echols was African–American until she filed her EEOC charge. *See* Clements Deposition at 104:9–13. If Clements was not aware that Echols was African–American, he could not discriminate against her on the basis of her race. Because the summary judgment evidence reveals a complete absence of facts supporting an intent on the part of Leon Clements to discriminate against Echols on the basis of her race, granting Plaintiffs' Motion for Leave to Amend would serve no purpose. Accordingly, Plaintiffs' Motion for Leave to Amend Complaint is hereby respectfully **DENIED**, Defendant's Motion for Summary Judgment is hereby **GRANTED**, and Plaintiff Echols's claim against Clements for race discrimination under § 1981 is hereby **DISMISSED WITH PREJUDICE.**

### C. Intentional Infliction of Emotional Distress

Plaintiffs allege that Clements intentionally inflicted emotional distress upon them. In order to maintain a claim of intentional infliction of emotional distress, a plaintiff must allege facts showing that "(1) the defendant acted intentionally or recklessly, (2) the conduct was extreme and outrageous, (3) the actions of the defendant caused the plaintiff emotional distress, and (4) the emotional distress suffered by the plaintiff was severe." *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993). To qualify as "extreme and outrageous," a defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d, *cited in Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993). The standard is so high that even a blatant ethnic slur does not qualify as extreme and outrageous conduct for purposes of an IIED claim. *See Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (holding that a supervisor's references, over a period of time, to the plaintiff as a "wetback" did not rise to the level of extreme and outrageous conduct). IIED claims do not lie

---

**16.** Plaintiffs cite the following exchange between Plaintiffs' counsel and Clements:

"Q: Mr. Clements, what are UTMB's policies in regards to racial discrimination?

A: Basically there aren't any. I mean, there are no—they allow no discrimination.

Q: Do you know what the policy states?

A: It's in the manual. I can't quote it verbatim.

Q: *What affirmative steps do you take as the* CAO to ensure equality among the races under the CMC umbrella of UTMB?

A: We go through numerous audits from just about everybody, and that's handled through our HR department.

Q: What type of audits?

A: Affirmative action; EEOC; we have inquiries from the State on a fairly consistent basis as to how many race categories we have working for us, Hispanic, blacks, Asians, whites."

Clements Affidavit at 102:25–103:17.

for ordinary employment disputes. *See* 965 F.2d 31, 33 (5th Cir.1992). Plaintiffs' IIED claims are fatally undermined by the fact that none of the actions allegedly taken by Clements qualify as a matter of law as extreme and outrageous. Further, Plaintiffs produce absolutely no evidence linking Clements to the alleged discrimination that they suffered.

Bates alleges that Clements intentionally inflicted emotional distress on her in the following ways: (1) denying her raise but granting a raise to Tom Wooldridge, Deposition of Linda Bates, Plaintiffs' Exhibit 1.1, at 94:12–18; (2) reducing her OPES raise, *id.* at 95:3–4; (3) failing to investigate her grievance filed with the Affirmative Action Office, *Id.* at 95:4–5 ("it was ignored for 90 days"); (4) at the EEOC meeting, Bates "felt like UTMB staff further retaliated against [her] for her complaints," *id.* at 95:6–8; (5) her job reclassification took too long, *id.* at 9–10; (6) drastic alteration of her job description submitted with her job reclassification request, *id.* at 10–12; (7) failure to grant her job reclassification request, *id.* at 12–13; (8) the general environment fostered by discrimination that Clements was responsible for, including (i) denial of permission to attend regional practice meetings, (ii) difficulty of access to equipment, and (iii) the general tenor that mental health services was an outside entity. *Id.* at 95:16–96:11. All of Bates's factual allegations fall within the range of ordinary employment disputes, and none qualify as extreme and outrageous. The Court also notes that because Clements was not present at the EEOC meeting, any acts committed in the meeting cannot be attributed to Clements and thus cannot support an IIED claim.

Dansbe alleges that Clements intentionally inflicted emotional distress on her in the following ways: (1) she has suffered extreme stress because Clements changed her job without any just reason or cause, Deposition of Debra Dansbe, Plaintiffs' Exhibit 2.1, at 27:6–8; (2) Clements told Dr. Murray that he did not like Dansbe's appearance because she was overweight or fat, and that she walked with a limp, all of which was "hurtful and stressful and embarrassing," *id.* at 15–21; (3) Clements made a comment to Mr. Stroud in the summer of 2000 that was negative about Dansbe and her performance in the area of recruitment, *id.* at 30:4–34:8. Dansbe did not personally hear the comments that Clements made regarding her appearance. Dansbe claims that Clements made the comments to Dr. Murray, who then relayed them to her. Likewise, Dansbe has no personal knowledge that Clements made negative comments to Mr. Stroud regarding her and her job performance. According to Dansbe, Clements made the comments to Stroud, who then relayed them to Mr. Brunyard, who told Dansbe that Clements had made negative comments about her. *Id.* at 31:12–32:20. Hearsay statements are not competent summary judgment evidence. *See Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir.1995) ("Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial."). The actions attributed to Clements by Dansbe do not approach extreme and outrageous conduct as defined by Texas law.

Doughty alleges that Clements intentionally inflicted emotional distress on her in the following ways: (1) at their September 28, 2001 meeting, Clements laughed at Doughty's request for a raise and told her that he seriously doubted he could get her more money, Deposition of Casi Doughty, Plaintiffs' Exhibit 3.1, at 36:20; (2) Clements stated at the same meeting that, now that Doughty had done what she needed to do, Clements would do what he needed to do, leading Doughty to believe her job was in jeopardy, *id.* at 47:2–10; (3) Clements

refused to share his expectations for Doughty at the September 28, 2001 meeting, *id.* at 49:4–11; (4) Clements put two of Doughty's projects on hold, *id.* at 48:12–49:3; (5) Clements objected to Doughty moving two employees to a satellite office off of Galveston, *id.* at 92:24–94:8; and (6) Clements asked Doughty's assistant for a key to Doughty's office. *Id.* at 21:4–21, 50:9–17.[17]

Echols alleges that Clements intentionally inflicted emotional distress on her in the following ways: (1) denying her request for a 10% raise and a 9.7% OPES pay increase, Deposition of Beverly Echols, Plaintiffs' Exhibit 5.1, at 86:25–87:6; (2) listing her on a potential Reduction in Force (RIF) list, *id.* at 87:7–11; (3) preventing her from getting documents that she needed to do her job, *id.* at 87:12–16; and (4) preventing her reclassification. *Id.* at 87:17–22. All of the actions attributed to Clements by Echols fall well within the range of ordinary employment disputes and thus cannot support an IIED claim. Furthermore, not a single one of these actions constitutes extreme and outrageous behavior.

Regarding Echols's allegation that she was placed on the RIF list, to argue that merely contemplating an employee's termination constitutes an extreme and outrageous action necessarily suggests that actually terminating an employee would certainly qualify as such. This does not describe the law in Texas. *See, e.g., Southwestern Bell Mobile Systems, Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998) ("[T]he mere fact of termination from employment, even if the termination is wrongful, is not legally sufficient evidence that the employer's conduct was extreme and outrageous ...."); *Wornick,* 856 S.W.2d at 734–35 (holding that, where a party acts within its legal rights in terminating an employee, "the fact of discharge itself as a matter of law cannot constitute outrageous behavior"). Further, Even if Echols had alleged some outrageous behavior in connection with her temporary listing on the RIF list, she has produced absolutely no competent evidence to support her allegation that Clements placed her on the RIF list. In her deposition, Echols stated that she did not know who was responsible for placing her name on the RIF list. Echols Deposition at 25:10–12. In fact, Echols stated that she received all of her information regarding the RIF process from her supervisor, Plaintiff Dupuy, who apparently received her information from a Dr. Murray. *Id.* at 25:13–19.[18] Hearsay statements are not competent summary judgment evidence. *See Fowler,* 68 F.3d at 126. Because Echols does not allege extreme or outrageous be-

---

**17.** At the time he requested a key to Doughty's office, Clements indicated that CMC had been written up by the fire marshal because the key to Doughty's office was not available. *See* Doughty Deposition at 21:10–21; *see also* Clements Affidavit ¶ 14 (stating that he requested the key to Doughty's office "strictly as a result of the fire audit" and that keys to other departments were also requested).

**18.** The following exchange took place between Echols and Defendants' counsel:

Q: Who was responsible for listing you as a potential person to be RIF'd?
A: I'm not sure.

Q: Okay. You can't tell me with a certainty that Mr. Clements is the one that directed that, can you?
A: I can only tell you what was told to my supervisor, Ms. Dupuy, was told to her by Doctor Murray, who is one of the people who was, I think, assisting with the RIFs.
Q: Okay.... I want to know whether you can tell me that you have any personal knowledge that Leon Clements is the person who decided your name would be on the list to be RIF'd.
A: Other than what was told to me?
Q: Right.
A: That's it.
Echols Deposition at 25:10–26:2.

havior, and because her claim based on the RIF list is not supported by competent evidence, Clements is entitled to summary judgment on her IIED claim.

The summary judgment proof reveals that Plaintiffs' IIED claims are either unsupported by fact or admittedly baseless.[19] Their complaints are based on little more than the impression that, because Mr. Clements is the head of the department, he must be personally responsible for every unpleasant thing that happens. Most importantly, Plaintiffs fail to allege that Clements engaged in extreme and outrageous conduct. None of the behavior attributed to Clements qualifies as intentional infliction of emotional distress as a matter of law. Finding that Plaintiffs' IIED claims against Clements are wholly unsupported by competent factual allegations, the Court **GRANTS** Defendant's Motion for Summary Judgment, and Plaintiffs' IIED claims are hereby **DISMISSED WITH PREJUDICE**.

IV. Conclusion

For the reasons stated above, the Motion for Judgment on the Pleadings of Defendants UTMB and Leon Clements in His Official Capacity is hereby **GRANTED**, Leon Clements' Motion for Summary Judgment Based on Qualified Immunity is hereby **GRANTED**, and Plaintiffs' Motion for Leave to Amend Pleading is hereby respectfully **DENIED**. As regards all dismissed claims, the Court will in due course enter a final judgment. In the interim, each Party is to bear its own taxable costs, attorneys' fees, and expenses incurred herein to date.

In consequence of this Order, and as discussed in note 15, *infra*, Plaintiffs are left with Title VII claims only. All discovery and pleading efforts expended hereafter shall be limited solely to those claims and defenses asserted in regard thereto.

**IT IS SO ORDERED.**

**19.** Plaintiff Dupuy stated in her deposition that she did not believe that she had a claim of intentional infliction of emotional distress against Clements. Deposition of Leslie Dupuy, Plaintiffs' Exhibit 4.1, at 48:7–49:13. Plaintiffs' Response indicates that Dupuy no longer wishes to assert an IIED claim against Clements. Because the Court has denied Plaintiffs' Motion for Leave to Amend Pleading on all other grounds, the Court finds no reason to grant leave to amend solely to delete Dupuy's IIED claim. In the interest of judicial economy, the Court will dismiss Dupuy's IIED claim with those of the remaining Plaintiffs.